UNITED STATES of America

v.

Larry STARKS, Appellant in No. 74–1966, et al.

Appeal of Alonzo ROBINSON, Appellant in No. 74–1947.

Appeal of Donald Everett ABNEY, Appellant in No. 74–1967.

Nos. 74–1947, 74–1966 and 74–1967.

United States Court of Appeals, Third Circuit.

Argued Feb. 27, 1975.

Decided April 21, 1975.

As Amended June 24, 1975.

Robert E. J. Curran, U. S. Atty., Donald F. Manno, Special Atty., U. S. Dept. of Justice, Marshall Tamor Golding, Atty., U. S. Dept. of Justice, Washington, D. C., for appellee.

Thomas C. Carroll, Defender Association of Philadelphia, Philadelphia, Pa., for appellant Alonzo Robinson.

Jack M. Myers, Zack, Myers & Atkinson, Philadelphia, Pa., for appellant Larry Starks.

Joel Harvey Slomsky, Philadelphia, Pa., for appellant Donald Everett Abney.

## OPINION OF THE COURT

Before VAN DUSEN, GIBBONS and HUNTER, Circuit Judges.

GIBBONS, Circuit Judge.

Following an investigation by the Philadelphia Office of the Justice Department's Special Strike Force, a grand jury named five men as defendants in a single count indictment charging them with violating the Hobbs Act, 18 U.S.C. § 1951.[1] In a ten-day jury trial which ended on July 1, 1974, two of the five defendants were acquitted. The other three, appellants Alonzo Robinson, Larry Starks, and Donald Abney, were found guilty and received custodial sentences. They appeal, alleging numerous deficiencies in the indictment, errors in the court's pre-trial rulings, in its conduct of the trial, and in its disposition of their post-trial motions. We reverse and remand for a new trial. We will discuss only those grounds on which our reversal is predicated, and in addition, those which may arise in the context of the new trial.

## DUPLICITOUSNESS

The indictment charges that the five defendants "did unlawfully and willfully conspire and attempt to obstruct, delay and affect commerce" by extorting money from the proprietor of Nookie's Tavern, "in order to continue in the business of selling alcoholic beverages contracted for and obtained in interstate commerce."[2] By appropriate pre-trial mo-

1. 18 U.S.C. § 1951 provides in pertinent part:

 "(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

 (b) As used in this section—

 . . . . .

 (2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

 (3) The term 'commerce' means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction. . . . ."

2. The indictment states:

 "That from on or about the 8th day of December, 1973, to on or about the 21st day of February, 1974, inclusive, at Nookie's Tavern, located at 6301 Wister Street, Philadelphia, Pennsylvania, and the area adjacent to said tavern, in the Eastern District of Pennsylvania, and within the jurisdiction of this Court, Larry Starks, Clarence Louis Starks, Alonzo Robinson, Donald Everett Abney, and Merrill Albert Ferguson, did unlawfully and willfully conspire

tions the defendants attacked this singularly inartistic indictment both on the ground that it did not sufficiently charge any crime, and on the ground that if it charged any crime it charged several, and was therefore duplicitous. Rule 8(a), Fed.R.Crim.P. provides that two or more offenses may be charged in the same indictment in a separate count for each offense.[3] Here, however, the indictment contained only a single count.

The Hobbs Act proscribes a number of separate offenses: (1) robbery; (2) extortion; (3) attempted robbery or extortion; and (4) conspiracy to commit robbery or extortion.[4] Each such offense also requires the federal jurisdictional element of obstruction, delay, or effect on interstate commerce. The indictment charged two such offenses; conspiracy to extort and attempt to extort. Since both were improperly charged in a single count, the defendants' pre-trial motions that the indictment be dismissed, or that the government be required to elect, should have been granted.

Duplicity is the joining in a single count of two or more distinct and separate offenses.[5] One vice of duplicity is that a general verdict for a defendant on that count does not reveal whether the jury found him not guilty of one crime or not guilty of both. Conceivably this could prejudice the defendant in protecting himself against double jeopardy. Another vice of duplicity is that a general verdict of guilty does not disclose whether the jury found the defendant guilty of one crime or of both. Conceivably, this could prejudice the defendant in sentencing and in obtaining appellate review. A third vice of duplicity is that it may prejudice the defendant with respect to evidentiary rulings during the trial, since evidence admissible on one offense might be inadmissible on the

and attempt to obstruct, delay and affect commerce, as that term is defined in and by Section 1951, Title 18, United States Code, to wit, interstate commerce, and the movement of articles and commodities in such commerce by extortion, as that term is defined in and by Section 1951, Title 18, United States Code, that is to say, by then and there attempting to obtain from another, to wit, one Ulysses J. Rice, then doing business under the name, style and description of Nookie's Tavern, and then engaged in the sale of alcoholic beverages contracted for and obtained in interstate commerce, certain property of the said Ulysses J. Rice, to wit, his money in amounts varying fron One Hundred Fifty Dollars ($150.00) to Five Hundred Dollars ($500.00) to be paid in order to continue in the business of selling alcoholic beverages contracted for and obtained in interstate commerce, the attempted obtaining of said property from said Ulysses J. Rice as aforesaid being then intended to be accomplished with the consent of said Ulysses J. Rice, induced and obtained by the wrongful use, to wit, the use for the purpose aforesaid, of actual and threatened force, violence and fear made to said Ulysses J. Rice.
In violation of Section 1951 of Title 18, United States Code."

3. Rule 8(a), Fed.R.Crim.P. provides:

"(a) Joinder of Offenses. Two or more offenses may be charged in the same indictment or information in a separate count for

each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan."

4. *See, e.g.,* United States v. Jacobs, 451 F.2d 530, 534 (5th Cir. 1971), cert. denied, 405 U.S. 955, 92 S.Ct. 1170, 31 L.Ed.2d 231 (1972).

"It will be observed that § 1951, supra, defines three offenses where robbery is not involved, namely, extortion, attempted extortion, and conspiracy to commit extortion or attempted extortion, which obstruct, delay, or affect interstate commerce."

5. See 1 C. Wright, Federal Practice and Procedure § 142, at 306 (1969). Duplicity should be distinguished from multiplicity, the charging of a single offense in several counts, and from misjoinder, the inclusion in separate counts of an indictment of offenses or defendants not permitted by Rule 8, Fed.R.Crim.P. The offenses of conspiracy and attempt in this case could have been included in separate counts of the same indictment since they were alleged to have been based on acts or transactions connected together. Rule 8(a). The defendants were properly joined in a single indictment since they were alleged to have participated in the same acts or transactions. Rule 8(b), Fed. R.Crim.P.

other.[6] Joining conspiracy and substantive offenses in the same count present this vice in a particularly aggravated form, because of the admissibility of declarations made by coconspirators. Assuming such a joinder, and a general guilty verdict, there would ordinarily be no way of discerning whether the jury found the defendant guilty of the offense in proof of which such coconspirator's admissions were properly admitted. Finally, there is no way of knowing with a general verdict on two separate offenses joined in a single count whether the jury was unanimous with respect to either.

■ The district court instead of dismissing the indictment or ordering the government to elect between the conspiracy charge and an attempt charge, directed the government to file a bill of particulars setting forth:

"(1) A statement as to whether the government intends to proceed to prove either a conspiracy, or an attempt to obstruct, delay and affect commerce and the movement of articles and commodities therein by extortion, *or both.*" (emphasis supplied)[7]

Had the words "or both" been omitted the order would have been appropriate, since requiring an election is an appropriate remedy for duplicitousness.[8] The government responded to the order by advising that it intended to proceed to prove both offenses. At the beginning of the trial defense counsel moved to require an election, but the motion was denied. At the close of the government's case the motion to require election was renewed, and once again denied. At the end of the entire case the matter of election was renewed in a request to charge which was refused.

■ Throughout the case it was perfectly clear to the district court (though it is still not clear to the government)[9] the acts were part of a transaction constituting a single offense. . . .' Here, appellants were charged in substance with a joint effort to extort money from Rice which, after an initial partial success, was aborted by their apprehension. The conspiracy and the attempt to effectuate that conspiracy would not, therefore, appear to be 'separate and distinct' offenses, but rather merely separate acts which were 'part of a transaction constituting a single offense.'" (Government Brief at 11–12) (emphasis in original).

The Government's Supplemental Brief Following Oral Argument at 4, continues to confound the issue.

"We do not dispute that the indictment charged appellants in one count with both conspiring and attempting to extort, and that conceptually a conspiracy and an attempt are discrete offenses. It does not follow, however, that their inclusion in one count constituted duplicitousness. . . . since as the indictment was worded, the conspiracy and the attempt were charged as merged offenses."

This argument suggests that when a statute denounces several acts as a crime an indictment or information drawn in the language of the statute is not duplicitous if all the acts are pleaded conjunctively in one count. *See, e.g.,* Crain v. United States, 162 U.S. 625, 16 S.Ct. 952, 40 L.Ed. 1097 (1896); Cordova v. United States, 303 F.2d 454 (10th Cir. 1962). However that rule has no application here since the

---

**6.** To some extent the same evidentiary problems would be presented by an indictment in separate counts. However separate counts would facilitate an explanation by the court of what evidence could be considered on each count and against each defendant. The district court below rejected the efforts of defense counsel to determine what evidence was being offered on each charge (Tr., Second Day, Sec. B., at 36) and did not marshall the evidence on the conspiracy charge as the defense had requested. (Tr., Eighth Day, at 146–47).

**7.** D.C.Crim. No. 74–133, Order of June 4, 1972.

**8.** *See, e.g.,* Bins v. United States, 331 F.2d 390, 393 (5th Cir.), cert. denied, 379 U.S. 880, 85 S.Ct. 149, 13 L.Ed.2d 87 (1964); United States v. Goodman, 285 F.2d 378, 380 (5th Cir. 1960), cert. denied, 366 U.S. 930, 81 S.Ct. 1651, 6 L.Ed.2d 389 (1961).

**9.** In a passage as inartful as the indictment the government brief argues:

"Abney further contends that, because a conspiracy to extort and an attempt to extort are separate offenses, the indictment was void for duplicitousness. His premise is questionable. 'Duplicity in an indictment means the charging of two or more *separate and distinct* offenses in one count, not the charging of a single offense into which several related acts enter as ways and means of accomplishing the purpose.' A count charging more than one act is not duplicitous 'if

that the indictment was duplicitous. The charge unambiguously states the court's understanding:

"Obviously, it becomes necessary for me to define both 'conspiracy' and 'attempt,' since the defendants are charged not with the substantive offense itself of obstructing, delaying, or adversely affecting interstate commerce by extortion but rather a conspiracy and attempt so to do.

Therefore, I shall define to you all of the requisites of both a conspiracy and an attempt, because all of these requisites must be found before the jury could find any defendant guilty." (Tr., Tenth Day, at 25–26)

The court then charged at length the elements of the crime of conspiracy, the evidentiary rules applicable to that crime, that there could be separate conspiracies, or an overall conspiracy, and that there must be proof of the commission of an overt act. Then the court charged:

"In this case the defendants are charged with a conspiracy and attempt, both as integral and essential parts of a single charge." (Tr., Tenth Day, at 35).

The charge continued with a definition of the elements of attempt to commit extortion, and of extortion. The court also charged that intended or attempted extortion must be one which had it succeeded would have obstructed, delayed or affected interstate commerce. Finally, toward the end, and separated in time from the definitions of conspiracy and of attempt, the court charged:

"I would also point out that in the indictment it is charged that the defendants were guilty of both conspiracy and an attempt and the essential elements of both of these offenses must be proved before any defendant could be found guilty." (Tr., Tenth Day, at 60).

The government has never abandoned its contention that the indictment charges only a single offense. Its brief on appeal equivocates, however, as to which offense that is. Finally it urges:

"In any event, the issue is academic. It is not a duplicitous count alone, but rather a failure to correct the duplicitousness 'in some manner' which constitutes error." (Government Brief at 13).

The duplicitousness was corrected, it is urged, by the charge, which required that the jury find each defendant guilty of both offenses in order to convict. It is argued that the error of not requiring an election, in other words, was harmless.

We have recently held that a misjoinder in violation of the statutory mandate of Rule 8(a) cannot be treated as harmless error under Rule 52(a). United States v. Graci, 504 F.2d 411, 414 (3d Cir. 1974). We need not, however, rule in this case whether the *Graci* holding would apply to a duplicitousness violation of the same rule, because at least one other error appears which requires a new trial. However, before that new trial the district court should require the government to make an election between the conspiracy and attempt charges.

## ADMISSION OF EXHIBIT G–3, A TAPE RECORDING

 The error in this case which requires a new trial arises out of the admission into evidence of a tape recording of an alleged conversation between the victim of the supposed extortion and some of the defendants. Some factual background is necessary to put the issue of admissibility of that tape recording in context.

Hobbs Act denounces a number of acts as *separate* offenses. In Callanan v. United States, 364 U.S. 587, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961), the Supreme Court expressly concluded that it was Congress' intent to maintain in the Hobbs Act the long-established distinction between the commission of a substantive offense and of a conspiracy as separately defined crimes even though both are contained in the same provision. The trial court thought so too, reading the indictment as charging two separate offenses, and so instructed the jury.

The government's principal witness was Ulysses Rice, who owned "Nookie's Tavern," a bar in Philadelphia. According to Rice, in December, 1973, Alonzo Robinson, a Black Muslim, whom he knew as "Alfonzo" visited the tavern on several occasions offering to sell him the Muslim newspaper, pies, orange juice and fish. On Saturday, December 8, 1973 Robinson and Ferguson, the latter one of the defendants whom the jury acquitted came to "Nookie's Tavern" and told Rice to have $200.00 for them later that day for "Founder's Day," a Muslim holiday. Robinson and Ferguson came to "Nookie's Tavern" on December 11th in the company of defendant Abney. Rice gave them $150.00. Robinson and Abney then returned on December 18th. Abney told Rice that he was to make payments of $200.00 a week, because if he could pay "taxes to the white man and the government," he could pay taxes to them. On December 19th, Rice was approached by defendant Starks in a movie theater. He told Rice the defendants had a meeting about him, that Rice was supposed to give $1,500.00, but that he, Starks, had got it down to $500.00. Between December 19, 1973 and February 19, 1974 Rice was in hiding in his apartment and did not talk to any of the defendants. On Tuesday, February 19th he was at "Nookie's Tavern" when Starks came to the tavern and asked him for $500.00 "to get the Black Mafia brothers out of jail." Starks told him to have the money by Thursday night, February 21st. After the February 19th conversation Rice approached the F.B.I. He was equipped with a tape recorder which was placed on his body, and given $500 in marked money in anticipation of the February 21st meeting.

There is no corroboration of Rice's testimony with respect to anything which occurred prior to February 21st which we have just related above. There are moreover, several factors which reflect upon his credibility. Among these are the suggestion in the record that while Rice was in federal protective custody pending trial, he was to be brought before a state court for trial on a charge of assaulting a police officer. However, on the day before his subpoena date in the state court, he was placed in a nonreporting pre-indictment probation program when the arresting officer failed to appear. In addition the record discloses a close proximity in time between the execution of a state warrant to search for narcotics in "Nookie's Tavern" by city police on January 20, 1974 and his interview with an F.B.I. agent concerning his dealings with appellants the next day. From the evidence the jury could have found that Rice had unusually strong motivations to shade his testimony in the government's favor. Thus, corroboration of Rice's testimony was important to the government's case.

The vital element in the government's case was Rice's recitation of the conversation between himself and Larry Starks on the evening of February 21, 1974 when the marked, government-furnished money was turned over to Starks. Starks was immediately arrested, but since the defendants contended that the solicitation was a voluntary contribution for Muslim religious causes, any evidence corroborating Rice's version was extremely important to the government's case. Therefore the government sought to corroborate Rice's testimony by the use of a tape recording of what purported to be the conversation.

The fact that Rice had been equipped with a tape recorder in anticipation of the February 21, 1974 meeting was disclosed during pre-trial proceedings to defense counsel. A tape recording was heard by them on three occasions between March 21, 1974 and May 3, 1974, and by the court at a pre-trial conference in chambers on May 3, 1974. Counsel were also furnished with a copy purportedly made from the original tape.

At the May 3rd conference the government revealed for the first time to the court and defense counsel that the "original" tape recording had been made in stereophonic sound, and that on all prior occasions the recording had been played in monaural sound. The copy supplied

to counsel had been recorded in monaural as well. The stereo recording was then played for the court, and defense counsel with the aid of headsets. While the stereo recording was apparently an improvement in audio reproduction over the monaural tape, the government still had been unable to transcribe its contents. In view of its lack of quality, defense counsel then objected to its introduction, and asked that it be examined by an expert to determine whether it was an original, or whether it had been altered in any way.[10] Thus, as early as May 3, 1974 defense counsel raised questions as to the authenticity of the tape. Defense counsel were furnished with a stereophonic copy of the "original" tape on June 11, 1974, one week before trial. They were never furnished with the "original."

Rice testified at the trial on June 19, 1974 that on February 21, 1974 he had concealed on his person a tape recorder furnished by the F.B.I., and that when Larry and Clarence Starks came into Nookie's Place he turned it on and kept it on during the whole conversation. He recounted conversations with Larry Starks, which supported the government's theory of extortion, the fact that he delivered $500.00 in marked bills, and the immediate arrest of the Starks brothers by the F.B.I. At that point Mr. Bravo, the government attorney, asked for leave to play the tape recording while Rice was on the stand. This colloquy followed:

"THE COURT: First of all, before that can be played it has to be properly identified all the way through.

MR. BRAVO: I understand that, Your Honor.

THE COURT: Whether that can be done while this witness is still on the stand, I don't know.

. . . . .

MR. BRAVO: I think, Your Honor, to be properly done, this witness would authenticate the tape.

MR. CARROLL: [defense counsel] Since it is inaudible, how can he?

THE COURT: It is conceivable that he could, but I think that you are going to have other authentication." (Tr., Second Day, Sec. B., at 66–67)

The trial then recessed for the evening. The next morning Rice returned to the stand and further testified under direct examination:

"Q. Now, have you had an opportunity to listen to that tape, the original?

A. Yes.

Q. And when was that?

A. Yesterday evening.

Q. What if anything did you do with that tape?

A. I sealed it and signed my name to it." (Tr., Third Day, at 85).

The government then produced a small yellow envelope (G–2) which Rice identified as the envelope in which, on the previous evening, he had sealed the tape. Rice then broke the seal on the envelope and produced a tape cartridge, marked "G–3" for identification. The court stated:

"You spoke of it as an original tape. Of course there is no evidence of that. It is simply a tape. But that may be marked separately as a separate exhibit." (Tr., Third Day, at 88).

Rice's examination then continued:

"Q. Mr. Rice, you testified that you listened to that tape?

A. Yes.

Q. And does that accurately portray what occurred on the evening of February 21st in your tavern?

A. Yes.

10. Referring to the May 3, 1974 conference, the court in a colloquy on admissibility of the tape recording during the trial stated:

"At that time I think I had indicated that I would probably rule that the tape was inad-missible because of the fact that it was inaudible and untrustworthy." (Tr., Third Day, at 117).

Q. Were you able to recognize any of the participants on that tape?

A. Yes I was.

Q. Who were they?

A. The voice on there was Large and my voice on there.

Q. And when you say Large, who do you mean?

A. Larry Starks.

Q. Were you able to understand any of the conversation?

A. Yes, I was." (Tr., Third Day, at 88–89)

The government then moved to introduce G–3 into evidence and play it for the jury. Defense counsel objected and the court sustained the objection on the ground that the government had failed to prove its chain of custody over the tape between February 21st and June 20th, or of the identity of the February 21st tape with that version played to Rice on June 19th. The government took the position that such proof was unnecessary; that Rice's testimony sufficed. The court then ruled that it would permit cross-examination of Rice concerning his authentication of G–3. Without conceding that Rice could authenticate G–3, counsel cross-examined Rice and established that on the evening of June 19th Rice had listened to two tape recordings, G–3, and another which Rice called a "duplicate," that the tape marked as "G–3" was much clearer than the "duplicate," and that he sealed the duplicate in a different envelope. (Tr., Third Day, at 101–03). Rice could not identify G–3 as the tape he turned over to the F.B.I. on February 21st, or establish chain of custody from the date to June 19. The only reason why he

identified G–3 as the "original" was that it was "much clearer". (Tr., Third Day, at 103, 109). He was then asked by defense counsel:

"Q. Then how can you tell that it is the original tape that was on your body?

A. Well, then, I guess I really couldn't tell then." (Tr., Third Day, at 110).

At that point the court ruled:

"All right. Exhibit G–3 will be received into evidence over the objection. It may be played to the jury." (Tr., Third Day, at 111).

While proof of facts creating a sufficient foundation for the admission of a tape recording is a matter to be decided by the trial court, it does not have unbridled discretion to disregard the problems inherent in use of such evidence. Tape recordings are not readily identifiable as the original version. They are peculiarly susceptible of alteration, tampering, and selective editing. Because proffer of such evidence may, in the particularized circumstances of a given case, involve one or more of these problems in varying degrees it is difficult to lay down a uniform standard equally applicable to all cases. However, a useful exposition which commends itself to us is that in Judge Herland's opinion quoted in the margin.[11] Moreover we agree with the statement by the Second Circuit that the burden is on the government "to produce clear and convincing evidence of authenticity and accuracy as a foundation for the admission of such recordings . .." *United States v. Knohl,* 379 F.2d 427, 440 (2d Cir. 1967), cert. denied, 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967).

---

11. "A review of the authorities leads to the conclusion that, before a sound recording is admitted into evidence, a foundation must be established by showing the following facts:

(1) That the recording device was capable of taking the conversation now offered in evidence.

(2) That the operator of the device was competent to operate the device.

(3) That the recording is authentic and correct.

(4) That changes, additions or deletions have not been made in the recording.

(5) That the recording had been preserved in a manner that is shown to the court.

(6) That the speakers are identified.

(7) That the conversation elicited was made voluntarily and in good faith, without any kind of inducement."

*United States v. McKeever,* 169 F.Supp. 426, 430 (S.D.N.Y.1958).

When a colorable attack is made as to a tape's authenticity and accuracy, the burden on those issues shifts to the party offering the tape, and the better rule requires that party to prove its chain of custody. Such a demand was made by defendants, resisted by the government, and refused by the trial court. The government contends that the presumption of regularity which attaches to the handling of evidence within the control of public officials overcomes the chain of custody problem. The cases relied upon, principally United States v. Brown, 482 F.2d 1226, 1228 (8th Cir. 1973), and United States v. Daughtry, 502 F.2d 1019, 1021 (5th Cir. 1974) suggest that when evidence of a physical or documentary nature has been introduced, the trial court is entitled to assume that public officials did not tamper with exhibits in their possession in the absence of some evidence suggesting otherwise. No authorities in this circuit standing for such a rule have been called to our attention. The presumption of regularity, if it can be dignified as a rule, does not serve as a substitute for evidence when authenticity is, as here, challenged on not insubstantial grounds. At best it may relieve the government of the necessity for offering proof of custody until the integrity of the evidence has been put in issue. Here, as early as the May 3rd pretrial conference, there were extant several versions or copies of the tape of varying degrees of intelligibility. The defendants put the government on notice that they questioned the tape's authenticity. If there is a presumption of regularity it cannot in these circumstances substitute for evidence or shift to the defendants the burden of disproving authenticity. Therefore, the erroneous admission of G–3, requires a new trial.

Immediately following its admission by the court G–3 was played for the jury and for counsel. At that point all defense counsel categorically represented to the court that G–3 did not sound like the stereophonic tape which was played for them at the pre-trial conference in chambers on May 3rd. They represented, as well, that G–3 sounded different from the duplicate stereophonic copy which the government furnished to them on June 11th. The court ruled:

"As I indicated, if counsel wishes to present any evidence in that regard, they may do so and the Government will not be precluded from presenting whatever evidence it wants as to how they handled this tape." (Tr., Third Day, at 127–28).

This ruling compounded the error of admitting G–3 without a proper foundation, by shifting to the defendants the burden of establishing that it was not the same recording which was made on February 21st.

The defense counsel then asked to have the stereophonic tape which had been furnished to them on June 11th played for the jury so that the jury could better judge whether G–3 was authentic. The government objected. After a lengthy colloquy, the court ruled:

"I am going to deny the motion at this time but that does not mean that I will not permit it to be played at some further time in the proceedings." (Tr., Third Day, at 135).

Defense counsel preserved their position by appropriate motions.

Defense counsels' position was that Rice's voice had been the only identifiable or audible voice on all of the versions of the tape they had heard during pretrial, whereas on G–3, for the first time, a voice which Rice identified as that of Larry Starks was also audible. It is significant that of the two alleged participants in the February 21st meeting with Rice, Larry Starks and Clarence Starks, only Larry Starks was convicted, although Rice attempted to implicate both brothers in the extortion attempt. Obviously the tape was a significant piece of evidence.[12]

12. The importance of Rice's credibility may be gleaned from the court's charge:

"Because in this case to a large extent the prosecution's or Government's case depends upon the testimony of Mr. Rice, his credibility is, of course, of crucial importance to you. . . ." (Tr., Tenth Day, at 14–15).

Later in the trial, the government offered the testimony of F.B.I. Agent Vernazzo, who testified that he placed his initials and the date on a tape cartridge taken from Rice on February 21st. (Tr., Sixth Day, at 168–69) He identified those initials on G–3, but he was unable to account for the whereabouts of the tape from the time he gave custody of the tape to Special Agent Jeter on February 22 until the date of trial. Nor was he able to state that the magnetic tape inside the cartridge G–3 was the same magnetic tape that was taken from the machine on Rice. (Tr., Sixth Day, at 169–71). There was no other attempt to authenticate G–3. Once more defense counsel moved to strike G–3, and once more the court denied the motion.

Defense counsel then represented to the court that over the previous weekend a request was made for the names of government employees who had custody of the tape between February 21st, and June 19th, and that the government attorneys declined to furnish such a list. They requested the court to direct that the government furnish such a list so that they could do what the court said they must do, that is, offer evidence suggesting the lack of authenticity of G–3. The court ruled:

"I am not directing the Government to supply any further discovery to the defense counsel at this time." (Tr., Sixth Day, at 177–78).

Thus, the court having in the midst of trial, shifted the burden to the defendants to unauthenticate G–3, it deprived them of the opportunity to meet that burden by denying them discovery of the names of the only witnesses who might have enlightened the subject. We recognize that motions for discovery made pursuant to Rule 16(b), Fed.R.Crim.P. are addressed to the sound discretion of the trial court. However, where as here, injustice will clearly result from the denial of a discovery motion, an abuse of discretion has been shown. Therefore, we find that it was error for the trial court to have refused the defendants' request for discovery under these circumstances.

In its final charge, the court instructed the jury with respect to the tape:

"Now, I would call attention to one other piece of evidence, and that is the tape which you heard. It was permitted into evidence merely to corroborate the oral testimony of Mr. Rice on the witness stand.

If you heard something on the tape said by someone whose voice you did not recognize as that of Mr. Rice, whom you did hear testify in court, you must entirely disregard that unless Mr. Rice himself expressly testified that that person made such a statement, and that he so testified while on the witness stand." (Tr., Tenth Day, at 39).

Thus the court repeated essentially the same confusing instruction which was given at the time G–3 was admitted in evidence. In both versions the jury was told in essence "you may find Rice's testimony about a conversation credible if the tape contains that conversation." The logical fallacy in the court's analysis is that on this record the tape is credible only if Rice himself is credible.

The government throughout the trial maintained, and maintains still, that Rice's testimony sufficed to make the tape admissible for all purposes. In argument to the jury, the government made use of the tape not merely corroboratively in accordance with the court's instructions but substantively as well. The government attorney argued to the jury that they heard on the tape Larry Starks tell Rice "I ain't jiving" and translated that into some sinister meaning bearing on the "putting in fear" element of the offense, even though Rice had never testified as to the "I ain't jiving" remark. Despite defense objections, the court did not caution the jury to disregard this argument. We have already concluded that it was error to have admitted G–3 into evidence. We also find that the court's charge as to its

use, and the government's argument as to what it proved mandate a new trial as well.[13]

## THE DEFENDANTS' MOTION FOR JUDGMENT OF ACQUITTAL

 The defendants urge that there should simply be a reversal because there is no evidentiary support for a finding that there was in fact any likelihood of an effect upon interstate commerce. The government's theory was that extortion from Rice would have had the natural effect, had the scheme been successful (as it was in one instance) of diminishing Rice's ability to purchase for resale, liquor originating in interstate commerce. There was evidence of a decline in resales during the period of the alleged conspiracy, but no evidence of declines in purchases. We conclude, however, that although this part of the government's case was extremely thin, it met the federal jurisdictional test for a Hobbs Act violation.

 In addition, the defendants urge that they are entitled to a reversal since the case was submitted to the jury on a conspiracy theory as well as an attempt theory, and because the government did not demonstrate that they had knowledge of the minimal effects on interstate commerce which were proved. The record does not show such personal knowledge. Defendants' contentions are based upon United States v. Crimmins, 123 F.2d 271, 273 (2d Cir. 1941) and cases which followed it such as United States v. Alsondo, 486 F.2d 1339, 1343 (2d Cir. 1973). Those cases adopted the view that for conviction of conspiracy to violate a federal statute involving effects upon interstate commerce, which effects are the basis for federal jurisdiction, the conspirators must be shown to have knowledge of such federal jurisdictional facts as well as knowledge of the wrongdoing proscribed. In United States v. Pepe, 512 F.2d 1129 (3d Cir. 1975) (appeal of DiGiacomo) and 512 F.2d 1135

(3d Cir. 1975) (appeal of Carucci), this court suggested that we would follow Alsondo. But on March 19, 1975, the Supreme Court reversed Alsondo, sub nom. United States v. Feola, ——— U.S. ———, 95 S.Ct. 1255, 43 L.Ed.2d 541 (March 19, 1975). It expressly rejected the Crimmins line of cases, and thus overruled the dictum in United States v. Pepe. ——— U.S. at ———, 95 S.Ct. at 1265–1269. Therefore a new trial is appropriate rather than a reversal with a judgment of acquittal.

## OTHER GROUNDS FOR APPEAL

 Since we are ordering a new trial it is appropriate to comment upon certain issues raised on this appeal which may recur in that trial:

(1) On this record the trial court was justified in refusing an instruction on the defense theory that the acts alleged were solicitations for a religious purpose. There is no exception to the Hobbs Act which permits extortion for such a purpose.

(2) On this record the court acted within the range of permissible discretion when, after Rice was impeached by a prior inconsistent statement, the court permitted his rehabilitation by use of a prior consistent statement. See Warrick v. Brode, 428 F.2d 699, 701 (3d Cir. 1970) (per curiam).

(3) A somewhat more serious issue is presented by the refusal of the trial court to conduct an individual voir dire of prospective jurors out of the presence of the entire panel. Counsel moved that the court conduct such a voir dire on the ground there had been extensive pre-trial publicity about the case and about the purported antisocial propensities of Black Muslims in general. Defense counsel urged that the court ask six specific questions of the individual jurors designed to elicit the jurors' attitudes toward Black Muslims. The court refused, and in-

---

13. We do not, of course, suggest that a properly authenticated tape recording is inadmissible for either corroborative or substantive purposes.

stead directed general questions to the panel at large with respect to prejudice on the basis of race, religion, or membership in the Black Muslims, requiring that the veniremen raise their hands if they desired to answer affirmatively.

We recognize that Rule 24, Fed.R. Crim.P. gives the trial court considerable leeway as to the manner of examination of prospective jurors. At the same time this court has said:

"We feel impelled to add, however, that we find much merit in the method of voir dire recommended in the American Bar Association's Standards Relating to Fair Trial and Free Press, § 3.4(a) (Approved Draft, March 1968). As an exercise of our supervisory powers over the district courts in this circuit, therefore, we recommend that in cases hereafter in which there is, in the opinion of the court

a significant possibility that individual talesmen will be ineligible to serve because of exposure to potentially prejudicial material, the examination of each juror with respect to his exposure shall take place outside the presence of other chosen and prospective jurors. * * * The questioning shall be conducted for the purpose of determining what the prospective juror has read and heard about the case and how his exposure has affected his attitude towards the trial. * * * Standards, § 3.4(a)."

United States v. Addonizio, 451 F.2d 49, 67 (3d Cir. 1972), cert. denied, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972).

In a case with serious racial and religious undertones and where the court is facing a ten-day trial, good sense would seem to suggest that the court adopt the practice of individual examination so that defense counsel may be in a position to make individualized judgments with respect to peremptory challenges. A small amount of time would be involved, when compared with the possibility of a new trial. While on this record we do not hold that the trial court abused its discretion, we are able to perceive of situations in which we might so decide. Total judicial resources will more likely be preserved by a cautious deference to the interest of the defendants in an unbiased jury.[14]

The judgment of the district court will be reversed and the case remanded for a new trial after the government has elected whether to proceed on either the Hobbs Act charge of conspiracy or attempt to extort.

**14.** We note that at the American Bar Association's recent midyear meeting held in Chicago, the House of Delegates after considerable debate passed a resolution supporting the concept of voir dire by counsel as a matter of right in federal civil and criminal cases. Both the A.B.A.'s Council of the Judicial Administration Division and its Board of Governors had recommended against adoption of the resolution. Nothing in this opinion should be construed as suggesting that interrogation of jurors must be conducted by counsel rather than the court.