878 F.2d 1436
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Antonio Jose FRANCO (88-5349), Alfredo Lopez (88-5350), and
Roque Marmolejos (88-5351), Defendants-Appellants.
 Nos. 88-5349 to 88-5351.
 United States Court of Appeals, Sixth Circuit.
 July 6, 1989.
 
 Before BOYCE F. MARTIN, Jr. and BOGGS, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Antonio Jose Franco, Alfredo Lopez, and Roque Marmolejos appeal their convictions on one count of possession of cocaine, with intent to distribute, in violation of 21 U.S.C. Sec. 841(a)(1) and on one count of conspiring to distribute a controlled substance in violation of 21 U.S.C. Sec. 846. Upon consideration of the defendants' numerous objections, we find no reversible error and therefore affirm.
 
 
 2
 * The defendants' troubles started when Karla Espinal, after having been arrested for conspiring to distribute cocaine, agreed, as part of her plea agreement, to set up a drug shipment into Lexington, Kentucky. In October 1987, she called her former drug contact, Elias Rivera, in Panama. Rivera told her, in a conversation conducted in Spanish, that he knew someone in Miami named Antonio who already had brought drugs into the United States. This conversation, as well as all subsequent ones discussed in this case, were taped by federal authorities. She asked her contact to give Antonio her telephone beeper number, which was, in fact, a Drug Enforcement Administration (DEA) number.
 
 
 3
 On November 5, 1987, a person named Antonio called the beeper and asked Espinal to call him. Espinal called the number and spoke, in Spanish, with an individual she identified at trial as defendant Antonio Franco. Franco assured her that he had the "tickets", a code word for cocaine. He gave Espinal his beeper number in Miami and discussed how they could ship the drugs from Miami to Lexington. They discussed transportation during several phone calls on November 5 and 6. On November 9, Franco finally confirmed that he would be able to provide at least 13 kilos of cocaine at a price of $18,000 per kilo plus $1,000 per kilo for transportation.
 
 
 4
 In another conversation on November 9, a Monday, Franco, referring to the people shipping the drugs, told Espinal that "the people are leaving here tomorrow at dawn, or saying Wednesday, early, right." Franco stated that he would fly to Lexington on Thursday. On November 10, Franco called Espinal and told her there was a change of plans and that the "people" would be arriving on Friday, November 13.
 
 
 5
 On November 12, Franco left a message on the DEA pager stating that he had arrived and was at the Days Inn in Lexington. DEA agents Rudy Lozano and Robbie Raffa, working undercover, accompanied Espinal to her first meeting with Franco at the Days Inn. After Franco told them the drugs would be delivered in an 18-wheel tractor trailer, the four of them began scouting for potential off-loading sites. Franco told them he normally used rest stops along highways as the drop-off point. This kind of site, however, was not acceptable to the agents. They convinced Franco to make the drop in a McDonald's truck stop they had pre-selected. Throughout these negotiations, Franco freely talked about his drug business and the potential for future transactions.
 
 
 6
 On November 14, Franco called Espinal and told her: "The ones that are making the return ... are nearby." He also told her that he was considering returning to Miami with the people making the delivery. Raffa and Lozano then went to meet with Franco. Lozano drove to the drop-off site with Franco in a pick-up truck, while Raffa followed in a separate car. On the way to the drop, Franco told Lozano he planned to go back to Miami with the truck. Lozano gave Franco the $13,000 to be given to Franco's associates for the delivery of the drugs.
 
 
 7
 After arriving at the truck stop, Lozano parked and Raffa pulled in behind him. Lozano told her to follow Franco's instructions. Franco started walking toward a tractor-trailer and instructed Raffa to park facing a trailer. Raffa then saw Franco make what she believed was a gesture of recognition to the driver of the trailer, Alfredo Lopez. A video tape of the encounter made by federal agents shows that Lopez made some sort of hand gesture after Franco's gesture.
 
 
 8
 After these actions, defendant Roque Marmolejos climbed down from the passenger's side of the trailer cab and pulled down the hood of the trailer. Franco walked to the passenger side of the cab. Marmolejos then joined him. The agents then observed Franco walking away from the cab carrying a large grey duffel bag, which he deposited in Raffa's car. After Franco and Lozano returned to the truck, the three defendants were arrested. The duffel bag contained 13 kilos of cocaine.
 
 
 9
 A search of the trailer was then conducted and $13,000 in marked bills which had been given to Franco in payment for the transportation of the drugs was discovered behind the seats in the cab. The trailer's registration indicated that the vehicle belonged to Lopez. Inside Lopez's wallet, the agents found a piece of paper bearing Marmolejos's phone number and beeper number, as well as an address book with the same numbers. On Marmolejos, the agents found three small vials containing cocaine. Other than three or four coconuts and a wooden skid, the trailer was empty.
 
 
 10
 The government notes that, Lozano testified that he read Lopez his rights and that Lopez indicated that he understood them. Lopez denies that he was read his rights. After the arrest, Lozano went to Lopez and told him, according to Lozano's testimony, "You know, we're having a problem searching for more cocaine. Rather than tearing up the whole trailer and the truck looking for this cocaine I would rather, if you wish to answer this question or if you wish to talk to me, tell me where it is." Lopez responded, "Eso es todo", meaning "that is all."
 
 
 11
 The defendants were indicted November 18, 1987. In January 1988, after a jury trial, the defendants were convicted on all counts. In February 1988, their motions for new trial were denied. Lopez was sentenced, using the sentencing guidelines, to 160 months on each count, the sentences to run concurrently. Franco received concurrent sentences of 189 months, and Marmolejos received 151 months, also running concurrently. This appeal followed.
 
 II
 
 12
 The defendants first contend that the court erred in allowing English language transcripts of the recorded Spanish conversations between Franco, Espinal, and the agents. The defendants argue that the court should have held a hearing, following the approach of U.S. v. Starks, 515 F.2d 112 (3rd Cir.1975), in order to determine if the transcripts were accurate and trustworthy. In particular, the defendants contend that the government must verify that the person preparing the transcripts had listened to the tapes. The defendants contend that no one fluent in Spanish, nor the parties involved, certified that all of the transcripts were accurate. (The defendants concede that Lozano verified the accuracy of the transcripts he prepared of conversations that involved him.) In addition, the defendants argue that reading the transcript to a jury breeds inaccuracy because only the actual tape will capture the correct tone of the conversation.
 
 
 13
 The decision to admit or not admit tape recordings rests within the sound discretion of the trial court; that court, however, must determine that those tapes are authentic, accurate, and trustworthy. U.S. v. Robinson, 707 F.2d 872, 876 (6th Cir.1983). The decision to use transcripts is also a matter for the trial court's discretion. Ibid. The government contends that the trial court took sufficient steps to ensure the accuracy of the transcripts and thus did not abuse its discretion. The court, the government points out, appointed interpreters for the defendants and allowed them the opportunity to review the transcripts for any inaccuracies.
 
 
 14
 We agree with the government. If there were any problems with the procedures for authenticating and using the transcripts, they arose from the defendants' willful failure to cooperate with the court. Time and time again, the court asked the defendants which transcripts they thought were inaccurate. They refused to identify any portion as inaccurate. The court asked them if they wanted a Starks-type hearing. They stated that they did not have any complaints as to the audibility of the tapes, the issue to which Starks is directed. They were concerned, instead, with the accuracy of the transcripts but could not state any problems they had with them. When they complained that they did not want the jury to read the transcripts, the court ordered that the transcripts be read out loud by witnesses. To a cynic, it would seem as if the defendants' problem is that they simply did not want the transcripts used.
 
 
 15
 As to the defendants' argument that no one (except for Lozano) verified the accuracy of the transcripts, this is simply not true. Espinal, the other party in the conversations, was told, when she read the transcripts during her testimony, that she should state if there were any inaccuracies in the transcript. The defendants, who had access to the tapes and participated in all the conversations, never pointed out any inaccuracies in the transcripts.
 
 
 16
 In sum, we find that, in a difficult situation involving tapes in a foreign language, the court below acted fairly in seeking to admit an accurate transcript. The defendants should have disputed any inaccuracies at trial. While one could plausibly argue that the better approach would have been to use independent translations, instead of government translations checked by the defendants, we hold that, given that the defendants had more than an opportunity to present their objections, there was no abuse of discretion.
 
 III
 
 17
 The defendants next argue that they should have been separately tried. They contend that their defenses were prejudiced by being tried together because each separate defense tended to incriminate the other defendants. For example, both Lopez and Marmolejos sought to argue at trial that they thought they were making a legitimate pick-up of furniture and did not know of any drugs, contending that it was the other person who knew about the drug deal.
 
 
 18
 Lopez argues that he was particularly prejudiced when his trial was not severed after the government asked Marmolejos, "Did you ever tell anyone at all that Mr. Lopez had arranged to have furniture picked up in Lexington, Kentucky?" Lopez argues that this question suggested to the jury that Lopez had arranged the drug pick-up because the jury could have interpreted the word furniture as a code word for cocaine. Lopez maintains that, even though after objection by the defendant the government decided not to pursue this line of questioning, he could not combat the prejudicial effect of this statement by cross-examination because it would only serve to emphasize the statement to the jury.
 
 
 19
 A reviewing court should reverse a trial court's denial of a motion for severance only where there is an abuse of discretion. U.S. v. Davis, 809 F.2d 1194, 1207 (6th Cir.1987). The general rule, particularly in conspiracy cases, is that parties who are indicted together should be tried together. Ibid.; Robinson, 707 F.2d at 879. The defendants have the burden of showing that they were prejudiced by the denial of the motion, in that the prejudice resulting from the misjoinder had a substantial and injurious effect on the jury's decision. Davis, 809 F.2d at 1207. Severance is not required even if defendants have different defenses; it is only warranted if the contrary defenses will mislead and confuse the jury. U.S. v. Gallo, 763 F.2d 1504, 1527 (6th Cir.1985).
 
 
 20
 We hold that the defendants cannot meet their burden of showing prejudice or confusion of the jury. As the government points out, while Lopez and Marmolejos sought to incriminate each other, they shared the same cover story. They both argued they were going to pick up furniture. The proof at trial focused on the patent absurdity of that story, no matter who it was told by.[1] Lopez, for example, testified that he did not know Franco and had no idea how much he would be paid for the shipment. Marmolejos testified that Lopez would decide how much the delivery would cost by looking at the furniture at pick-up time. Both defendants claim they knew nothing of the grey duffel bag. In short, there was nothing about either defendant's defenses that was severely prejudiced by joinder. There was no confusion because the issue the jury had to determine was clearly whether the two defendants knew they were in Lexington to deliver drugs.
 
 
 21
 As to the objection to the government's questioning of Marmolejos, the government was only trying to impeach Marmolejos with a prior inconsistent statement. It never intended to suggest, in that question, that Lopez had arranged a drug pick-up. Indeed, in asking the defendant if he stated earlier that Lopez had arranged the furniture pick-up, the government was only restating what Lopez himself had said. While there was some possibility of prejudice to Lopez if the inquiry were continued, the question was not meant to be, nor was it, prejudicial. There was, therefore, no error in the refusal to sever the trials.
 
 IV
 
 22
 Franco argues that the court below erred in admitting Lozano's testimony reciting statements made by Franco to Lozano. The conversations at issue were taped and were also later summarized in a written report made by Lozano. Franco argues that the court erred in admitting the statements because the government did not provide him a copy of the written report until the day before the trial. Franco argues that this late disclosure violates Rule 16(a)(1)(A) of the Federal Rules of Criminal Procedure, which requires the government to disclose, upon the request of the defendant, any written or recorded statements made by the defendant. Franco argues that his defense was prejudiced by the late disclosure because he does not speak English and there was not sufficient time to meet with an interpreter and go over the new evidence before the cross-examination of Lozano.
 
 
 23
 The government contends that it met any obligations under Rule 16 by supplying the actual tapes well in advance of the trial. In addition, the government contends that the statement is not discoverable under U.S. v. Green, 548 F.2d 1261, 1267 (6th Cir.1977), which held that Rule 16 only applies to statements made to known government agents, not "spontaneous, unsolicited admissions, made within hearing of an undercover police officer." In any event, the government points out that the defendant had two days to review the statment before Lozano testified. We find that the trial court made no error in admitting the evidence. The government turned over the tapes that were the source of the testimony well before trial, and, in any event, as we stated in Green, Rule 16 was meant to provide discovery only of statements given to known government agents.
 
 V
 
 24
 Lopez argues that his "eso es todo" statement to Lozano was coerced and that the admission of this statement was a violation of his fifth amendment rights. He argues that he was tired, frightened, and "disoriented," when Lozano threatened to destroy his livelihood, his truck, if he did not tell him where the rest of the drugs were. Lopez argues that, under the totality of the circumstances, his statement that there were no more drugs in the trailer was obviously coerced.
 
 
 25
 The government denies that the statment was coerced and contends that the trial court did not err in admitting the statement. We agree. The circumstances surrounding the statement, in and of themselves, do not show there was coercion. Lozano testified, despite Lopez's denial, that he read Lopez his rights and that he did not coerce Lopez. He merely succeeded in convincing Lopez that making the statement was preferable to having the truck damaged. In addition, Lopez did not raise the coercion argument in the pre-trial suppression hearing dealing with this statement. Lopez did not testify at that hearing, and the court, when the objection to Lozano's testimony was raised at trial, correctly held that any attempt by Lopez to challenge the admissibility of the statement by his own testimony was untimely. Lopez was thus forced to rely on what he termed the inherently coercive character of the statement. Given these circumstances, we find that the judge acted correctly in allowing the statement.
 
 VI
 
 26
 Lopez argues that the trial court erred in using statements of his alleged co-conspirators against him because there was not sufficient proof that Lopez was part of the conspiracy. For example, Lopez contends that his motion for mistrial should have been granted when certain of Franco's conversations with Espinal referring to Franco's communications with the drug delivery men were admitted against Lopez. Lopez contends that the government did not present sufficient non-hearsay evidence to show that he was one of the men referred to in the hearsay conversations. Lopez points out that: his name was never mentioned in any of the conversations; no drugs were found on him nor did anyone testify that he touched any drugs; and there was no testimony that he knew Espinal or Franco. In short, the defendant contends that there is no real evidence that connects him to this conspiracy; it is only by reading references to Lopez into Franco's vague hearsay discussions of the delivery men that Lopez can be considered a member of the conspiracy.
 
 
 27
 The Supreme Court held, in Bourjaily v. U.S., 107 S.Ct. 2775 (1987), that the questions of whether there is a conspiracy and whether the objecting defendant was a participant are preliminary questions of fact to be resolved by the trial court. Id. at 2779. The standard of proof is preponderance of the evidence. Ibid. Both hearsay and non-hearsay evidence can be considered in the resolution of these questions. Id. at 2782. The court's findings on these issues are findings of fact that are not to be overturned unless they are clearly erroneous. Ibid.
 
 
 28
 The government argues, and the district court found, that a preponderance of the evidence demonstrated that there was a conspiracy in which Lopez was a participant. The record, as the government points out, reveals that: (1) Franco repeatedly referred to the transporters in the plural; (2) Lopez owned the truck; (3) Lopez's story that he was picking up furniture was incredible, especially considering that he was at the truck stop before the agents arrived; (4) the money was found behind the driver's seat and the drugs were also located behind the seat; (5) he made the "eso es todo" statement; (6) he made a gesture of recognition to Franco; and (7) Franco stated that he was going back with the truck, even though Lopez said he did not know him. Given this evidence, we cannot conclude that the trial court's decision to admit the statements of Lopez's co-conspirators against the defendant was clearly erroneous.
 
 VII
 
 29
 Franco next argues that the trial court erred in finding that he was the manager or supervisor of a conspiracy numbering five individuals that was in operation after November 1, 1987. This finding led to an increase in Franco's sentence because a manager of a conspiracy numbering at least five persons receives an increase of three levels in the sentencing guidelines. Sentencing Guidelines Manual, Sec. 3B1.1(b). Franco argues that the court erred in looking to acts taking place before November 1, 1987, the effective date of the guidelines, in order to find a fifth member of the conspiracy. Franco argues that this reaching back beyond the effective date resulted in an unconstitutional ex post facto punishment. The person at issue here is Elias Rivera, the Panama contact called by Espinal in late October.
 
 
 30
 The government contends that there is no ex post facto problem because Rivera was a member of the conspiracy right up to its end. A conspirator is deemed to be part of the conspiracy until its termination. U.S. v. Hamilton, 689 F.2d 1262, 1268 (6th Cir.1982). The government also points to U.S. v. Brown, 555 F.2d 407, 417 (5th Cir.1977), which held that a RICO conspiracy that began before the effective date of the act was still punishable under the act if at least one overt act took place after the effective date. The government argues that Brown is analogous to this case in that the conspiracy started before November 1, 1987 and continued past that date. Franco argues that this case is not like Brown in that it is specifically the pre-enactment action, and no other, that triggers the sentencing provision. He contends that it might be different if Rivera had committed another act after the effective date, but since all his actions took place before November 1, he should not be counted in the calculations.
 
 
 31
 We find that the court below did not err in making the finding in question.[2] It is an elementary proposition of conspiracy law that, unless there is an explicit withdrawal, each member at any time is deemed a member of the conspiracy throughout the length of that conspiracy. This is true no matter when the acts furthering the conspiracy occur. In sum, since the conspiracy lasted into the guidelines period, supervision of each person continued after the guidelines date, making the court's finding a reasonable one.[3]
 
 VIII
 
 32
 Lopez and Marmolejos next contend that Sec. 3C1.1 of the Sentencing Guidelines, which allows an increase in punishment if the defendants are found to have given perjurious testimony, burdens the constitutional right to decide whether to testify guaranteed under the fifth amendment of the Constitution. The government contends that there is no right to commit perjury, even in presenting a defense. U.S. v. Wong, 431 U.S. 174, 178 (1977). The defendants respond that, while they can be prosecuted for perjury, they should not be punished without a trial or other protections. In support of this contention, they cite Spevack v. Klein, 385 U.S. 511 (1967), in which the Court held that an attorney could not be disbarred for not testifying in a judicial inquiry into his affairs because it would be an unconstitutional penalty on exercising one's fifth amendment privilege. The defendants contend that this extra punishment is a burden. It is our view, however, that there is a real difference in imposing punishment on someone for lying and punishing someone for not testifying. Before the enactment of the guidelines, district courts were given wide discretion to consider a number of factors in imposing a sentence, including the veracity of the defendant's testimony at trial. U.S. v. Barbara, 683 F.2d 164, 166 (6th Cir.1982). This provision merely codifies this practice. The mere codification of this understanding does not present any fifth amendment problem.
 
 IX
 
 33
 Lastly, Marmolejos contends that the court below erred in not finding that he was a "minor participant" in the conspiracy, thus meriting a reduction of two sentencing levels under Sec. 3B1.2(b) of the Sentencing Guidelines. The defendant points out that the trial court referred to him as a "pawn in the business." Note 3 to Sec. 3B1.2(b) defines a minor participant as "any participant who is less culpable than most participants but whose role could not be described as minimal." A district court's finding as to whether a defendant fits within this definition should not be reversed unless it is clearly erroneous. U.S. v. Mejia-Orosco, 867 F.2d 216, 221 (5th Cir.1989).
 
 
 34
 Putting aside the fact that he did get less punishment (151 months to Lopez's 160), it seems clear to this court that Marmolejos was no less culpable in the crime than Lopez. It is true that Lopez owned the truck and had $1,200 on him. However, any such marginal differences do not require the trial judge to make a finding a lesser culpability. Marmolejos had drugs in his possession, and more importantly, participated in the transferring of the cocaine. We cannot find that there was an abuse of discretion in failing to mitigate his sentence further. For the foregoing reasons, the convictions and sentences of the defendants are AFFIRMED.
 
 
 
 [1]
 Indeed, as discussed later, Lopez and Marmolejos were penalized when sentenced for lying at trial
 
 
 [2]
 We assume, without deciding, that there would be an ex post facto problem if conduct undertaken prior to the effective date of the guidelines were considered in guidelines sentencing
 
 
 [3]
 Franco also objects to the inclusion in the sentencing report of an arrest made in Mexico before the guidelines period. The govenment concedes that the arrest should not have been included in the report. The trial court, however, struck the reference to the arrest before sentencing. Since the arrest was not considered in sentencing, its initial inclusion in the report was not prejudicial error