**UNITED STATES, Appellee,**

v.

**Michael A. STRANGSTALIEN, Sergeant,
U. S. Air Force, Appellant.**

No. 33,737.
ACM 22089.

U. S. Court of Military Appeals.

Aug. 13, 1979.

For Appellant: *Linda J. Ravdin, Esquire* (argued); *Colonel Robert W. Norris, Major*

*Gary C. Smallridge, Frank Munger, Esquire* (on brief); George J. Terwilliger, Gary Verburg (Legal Interns, Urban Law Institute, Antioch School of Law).

For Appellee: *Major Gilbert J. Regan* (argued); *Colonel Julius C. Ullerich, Jr.* (on brief); *Major William T. Snyder, Captain Charles F. Teschner.*

Opinion of the Court

FLETCHER, Chief Judge:

On four occasions, both on a military base and off, the appellant sold substances alleged to be marijuana or lysergic acid diethylamide (LSD) to an undercover agent of the Air Force Office of Special Investigations (OSI). The substances thus obtained were secured by an evidence custodian at Fort Meade, Maryland, and subsequently mailed to the laboratory at Fort Gordon, Georgia. Exhibits consisting of these substances and the laboratory analysis were admitted into evidence at trial.

Appellant's general court-martial before a military judge sitting alone resulted in a bad-conduct discharge, total forfeitures, reduction to the lowest enlisted grade, and confinement at hard labor for 14 months. This sentence was approved by the convening authority and affirmed by the United States Air Force Court of Military Review.

I

We first consider the military judge's denial of a motion to dismiss specifications 1 and 4 for lack of jurisdiction in that there was no showing of service connection. The initial sale of an hallucinogen,[1] as revealed by direct examination of the undercover agent, resulted in transfer of the drug and payment of the purchase price at an off-base residence. The undercover purchaser had begun his infiltration by spreading the word that he had an interest in purchasing drugs. This led to his acquaintance with the accused and a purchase agreement of a specific amount and price. The agreement,

viewed as a contract to sell, was formulated on the base in a barracks building.

■ Turning, as is proper, to the *Relford*[2] analysis, we perceive that the sale was the result of a contract created on a military installation. While the execution of the terms of sale occurred off-base, the contractual agreement was made in barracks under military control. The commission of the crime, viewed contractually, therefore, did not occur solely at the locus of transfer of the substance, which factor under the second or third *Relford* criterion might deprive the military courts of jurisdiction. In *United States v. McCarthy,* 2 M.J. 26 (C.M.A.1976), we spoke of the formation of the criminal intent for the offense on post as weighing heavily in favor of military jurisdiction in a marihuana transfer offense. In the case of a drug sale such as the one before us in specification 1 of the Charge, this *McCarthy* factor is equivalent to the formation of a contractual agreement on base, even with terms yet to be completed off base. *See United States v. Hedlund,* 2 M.J. 11 (C.M.A.1976). Thus, it was not error to deny the defense motion to dismiss the first specification. However, regarding the fourth specification of the charge, which also is jurisdictionally challenged in this appeal, we find no evidence in the record elucidating the locale of the negotiations leading to the sale of marihuana, and moreover, under *Relford,* find no analytical criteria resolving subject matter jurisdiction in favor of military courts.

Once again, we are compelled to reject the government's argument that by charging the sales as a violation of a regulation, the proper focus of jurisdictional inquiry is not application of the *Relford* criteria but, rather, an examination of the legality of the order. *United States v. Alef,* 3 M.J. 414–17 (C.M.A.1977); *United States v. Williams,* 2 M.J. 81 (C.M.A.1976). Nor do we sustain the lower court in their analysis that these four transactions, occurring on

---

1. Negotiations for mescaline demonstrated in the record were couched in such a way as to embrace the substance (LSD) sold.

2. *Relford v. Commandant,* 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971).

divers days, find themselves properly in the military courts because of some tenuous relation as links of a "chain of illicit drug events".[3]

## II

After hearing oral argument, we ordered briefs on an additional question:

WHETHER, CONSISTENT WITH THE SIXTH AMENDMENT, THE GOVERNMENT CAN MEET ITS BURDEN OF PROOF IN A NARCOTIC CASE ABSENT TESTIMONY OF A CHEMIST OR OTHER QUALIFIED WITNESS CONCERNING THE IDENTITY OF THE PROFFERED EVIDENCE, THAT IT IS A PROHIBITED SUBSTANCE UNDER THE STATUTE, OR HAVE OBTAINED A STIPULATION TO THAT EFFECT.

The second issue originally granted in this case was framed as follows:

WHETHER IT WAS ERROR TO ADMIT INTO EVIDENCE FOUR ITEMS OF REAL EVIDENCE WHERE THE CONNECTION BETWEEN THE ITEMS AND THE APPELLANT AND THE CRIME WAS NOT SHOWN, AND FURTHER, THAT A LABORATORY REPORT ADMITTED INTO EVIDENCE HAD NO PROBATIVE FORCE.

## A

 It is axiomatic that under the United States Constitution the Government carries the burden of proof of each element of a criminal offense and absent its presentation of sufficient evidence, no burden ever shifts to the accused. *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970);

*Thompson v. Louisville*, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960). An essential element of the regulation violation offense of which our appellant was charged consisted of competent evidence identifying the substances sold as specifically prohibited. Article 92, Uniform Code of Military Justice, 10 U.S.C. § 892; A.F.R. 30–2, § 4–2. Evidence thus presented against the service member must satisfy the protections guaranteed him by virtue of the Sixth Amendment.[4]

We are called upon to examine the question of the admissibility of the report of a government laboratory chemical examiner, establishing the chemical profile of the substances in this case, which was excepted from the rule of incompetent hearsay, and received in evidence as a business entry exception. In this area we do not write on a clean slate. *United States v. Evans*, 21 U.S.C.M.A. 579, 45 C.M.R. 353 (1972), established that a report detailing the result of chemical analysis prepared by a state government agency qualifies for the business record exception and may, as such, be admitted into evidence. Tangential analysis was given in that opinion to the issue specified from the bench in the instant case: the relationship between the protections of the Sixth Amendment and the burden of establishing the identity of a prohibited substance. Later, in *United States v. Miller*, 23 U.S.C.M.A. 247, 49 C.M.R. 380 (1974), this Court examined the right of confrontation and cross-examination in light of guaranteeing a fair trial as the ultimate constitutional goal.[5] That case acknowledged and discussed the long-recognized exception to the rule against hearsay, the business record entry which possesses the "hallmarks of authenticity" because made in the regular course of business. *McDaniel v. United*

---

**3.** With due respect to the lower court, we find that the accused's statement that if the agent declined his offer, he could sell the marihuana himself on the installation is cited with irrelevant application. Proper analytical application of *Relford* criterion 10 (the absence of any threat to a military post) is to jurisdiction of the subject matter charged: violation of a regulation by selling marihuana off-base.

**4.** *United States v. Williams*, 16 U.S.C.M.A. 210, 36 C.M.R. 366 (1966); *United States v. Jacoby*, 11 U.S.C.M.A. 428, 29 C.M.R. 244 (1960).

**5.** *Pointer v. Texas*, 380 U.S. 400, 405, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). *See Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968).

*States*, 343 F.2d 785 (5th Cir. 1965), *cert. denied*, 382 U.S. 826, 86 S.Ct. 59, 15 L.Ed.2d 71 (1965); *Otney v. United States*, 340 F.2d 696 (10th Cir. 1965); *United States v. Leathers*, 135 F.2d 507, 511 (2d Cir. 1943). *Miller* characterized the preparation of the chemist's report in an Army crime laboratory as the establishment of a neutral fact; thus, the report of the identity of the subject matter was correctly admitted into evidence. Both *Evans* and *Miller* guaranteed the appellant's right to challenge the report's maker regarding his competency and the regularity in employment of procedure and subject him to cross-examination on his statement of analysis.

In a seminal federal case on chemical reports as business records, *United States v. Ware*, 247 F.2d 698 (7th Cir. 1957), the notation made in the regular course of business of a government chemist written on the envelopes containing the specimens was allowed into evidence under the so-called Shopkeeper's Rule, 28 U.S.C. § 1732. "These exhibits . . . satisfy the underlying reason for this exception to the hearsay rule and the admission of this class of statements under section 1732—the probability of their trustworthiness." *Id.* at 700. The regular course of both civilian and military government chemical laboratories is to systematically analyze, then record and report, that analysis. In this setting, the likelihood of reliability and trustworthiness has frequently been deemed probable. *United States v. Miller, supra* ; *United States v. Evans, supra* ; *United States v. Parker*, 491 F.2d 517 (8th Cir. 1973), *cert. denied*, 416 U.S. 989, 94 S.Ct. 2396, 40 L.Ed.2d 767 (1974). *See also United States v. Frattini*, 501 F.2d 1234 (2d Cir. 1974); *cf. Palmer v. Hoffman*, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1942).

■ As was made clear in both *Miller* and *Evans*, the Manual for Courts-Martial, United States, 1969 (Revised edition), provides a business entry exception to the hearsay rule,[6] a method for authentication of that entry,[7] and the further provision that: "Neither the official record nor the business entry exception to the hearsay rule renders admissible in evidence writings or records made principally with a view to prosecution, or other disciplinary or legal action, as a record of, or during the course of an investigation into, alleged unlawful or improper conduct." [8] This Court has earlier expressed the view that a chemist—even one in a governmental laboratory—does not perform his duties principally with a view to prosecution, discipline, or other legal action, as expressed in paragraph 144d, Manual, *supra*. "He does no more than seek to establish an intrinsically neutral fact, the identity of the substance itself." *United States v. Evans, supra* at 582, 45 C.M.R. at 356. We continue to hold that view.

A writing is authenticated under the Manual [9] "by proof that it came through a reliable source from a business whose regular course it was to make a memorandum or record of the act, transaction occurrence, or event, for it may be inferred from this proof that the writing was in fact made as a memorandum or record in the regular course of that business." Moreover, it is not essential that such "entry be authenticated by the person who made it or that [the particular] authenticating witness have personal knowledge that the particular entry [is] correct"; [10] rather, it merely must have been made in the regular course of business.

■ Furthermore, authentication of a writing may be waived by lack of objection to the document. Paragraph 143b, Manual, *supra* ; *United States v. Evans, supra* ; *United States v. Castillo*, 1 U.S.C.M.A. 352, 3 C.M.R. 86 (1952).

■ The facts of this case demonstrate that Exhibit 5—the report of chemical analysis—was properly authenticated under the

6. Paragraph 144c, Manual for Courts-Martial, United States, 1969 (Revised edition).

7. *Id.*

8. Paragraph 144d, Manual, *supra*.

9. Paragraph 144c, Manual, *supra*.

10. *Id.*

Manual provision.[11] Accompanying the report was a certification from a custodian of records of the investigative laboratory certifying that the report was prepared in the regular course of business of the laboratory and stated the results of analyses performed on the listed items. No objection to the authentication appears in the record. The report, as admitted, then, constituted a proper business entry in terms of paragraph 144c of the Manual and Fed.R.Evid. 803(6).

Though there was here a lack of objection to Exhibit 5, we reiterate an ancillary issue addressed in *Miller*. Even under the analysis propounded in the foregoing paragraph, there is no bar to a defense challenge of the accuracy of the chemical examination. Although we allow the entry into evidence as a properly authenticated business entry, this does not stop the introduction of evidence regarding inaccuracy of procedures or incompetency of the examiner. Upon affirmative request, the analyst may be summoned for cross-examination on his statement.[12] There was no affirmative request in this case; lack of objection to introduction of Exhibit 5 waived the contest.

B

The appellant further contends that there is a failure on the part of the Government to make a *prima facie* showing that Exhibits 1–4 represent the same items sold to the undercover agent by the appellant on the four occasions in question. He concedes that Agents Rogan, Waland and Jackson, in testifying on the methods employed in care and transfer of the substances, adequately established a chain of custody up to the point of mailing to the chemical laboratory at Fort Gordon, Georgia; but he argues that the absence of eye-witness knowledge

reflected in testimony regarding the handling and custody of the items at the analysis center breaks the chain of custody.

■ Counsel for the appellant correctly argue that for the results of a chemical analysis to be admissible, they must meet the general requirements applied to evidence: competency, materiality, and privilege. Inasmuch as we have signaled our satisfaction that a properly authenticated laboratory report is of adequate trustworthiness due to regular scientific methods and procedures to warrant its admission into evidence as a business entry, so also we presume the regularity of procedure in the handling and storage of the specimens to insure absolute identity between the items received, then analyzed, and this subsequent representation in the written report. This is, furthermore, in accord with the well-established rule of law that without a contrary showing, the presumption of regularity supports the official acts of public officials.[13] As we presume regularity in the chemical laboratory business handling of the specimen absent contrary showing, so the lack of a break in the chain of custody leads us to reject the defense assertion that the laboratory report represented in Exhibit 5 had no probative force.

The decision of the United States Air Force Court of Military Review is reversed as to specification 4 of the Charge. The finding of guilty of that specification is set aside and the specification is dismissed. The sentence is set aside. The record of trial is returned to the Judge Advocate General of the Air Force for submission to the Court of Military Review for reassessment of the sentence based on the remaining findings of guilty.

11. *Id.*

12. *See Flores v. State*, 491 S.W.2d 144 (Tex.Cr. App.1973), where the director of a crime laboratory which had performed an examination refused to testify for the defense unless retained as an expert. Citing the Sixth Amendment right to compulsory process of witnesses, the Texas Court of Criminal Appeals held the trial judge erred in failing to instruct the witness to testify about the previously conducted

examination. Cf. Westen, *Confrontation and Compulsory Process: A Unified Theory of Evidence for Criminal Cases*, 91 Harv.L.Rev. 567, 619 n.143 (1978).

13. *United States v. Brown*, 482 F.2d 1226, 1228 (8th Cir. 1973); *Brewer v. United States*, 353 F.2d 260, 263 (8th Cir. 1965); *Gallego v. United States*, 276 F.2d 914 (9th Cir. 1960).

COOK, Judge (concurring in part and dissenting in part):

■■■ I agree with the principal opinion that the laboratory report was admissible as a business record and that the chain of custody was adequately established. Any question as to its authenticity was waived by a failure to object at the trial level. *United States v. Miller*, 23 U.S.C.M.A. 247, 49 C.M.R. 380 (1974); *United States v. Evans*, 21 U.S.C.M.A. 579, 45 C.M.R. 353 (1972). I must express my disagreement with the statement in the principal opinion that the analyst must be called upon the mere request of an accused. A requirement that the Government must produce a defense requested witness without a showing of his necessity for the defense is contrary to existing law. *United States v. Wagner*, 5 M.J. 461 (C.M.A.1978); *United States v. Tangpuz*, 5 M.J. 426 (C.M.A.1978); para. 115, Manual for Courts-Martial, United States, 1969 (Revised edition). In my opinion, *Miller* and *Evans* did not establish a different rule for an analyst. The business entry exception was tailored to allow reliable and accurate records to be introduced at trial without the necessity of calling the maker. Obviously, if necessity is shown the analyst must be called. *See United States v. Gladwin*, 14 U.S.C.M.A. 428, 434, 34 C.M.R. 208, 214 (1964). However, to require the production of the analyst at the whim of the defense would defeat the purpose for the business entry exception.

■■■ I agree that specification 1 was properly tried by a court-martial, but I would also hold that there was sufficient service connection to warrant the exercise of military jurisdiction over specification 4. Appellant was convicted of four specifications alleging the sale of contraband to the same undercover agent. The transaction alleged in specifications 2 and 3 occurred on base and, as set out in the majority opinion, although the sale alleged in specification 1 occurred off base, such sale was negotiated on base. Thus, appellant's reputation as a dealer in contraband was established on base and the fourth sale involved the same undercover agent. Therefore, I perceive a direct connection between the off-base and on-base transactions. *See* my separate opinion in *United States v. Chastain*, 4 M.J. 91 (C.M.A.1977). I would affirm the decision of the Court of Military Review. However, to effect a disposition of this case, I concur with the Chief Judge in setting aside the sentence and directing reassessment by the Court of Military Review on the basis of the findings of guilty affirmed by him.

PERRY, Judge (concurring in part and dissenting in part):

■■■ I agree with Chief Judge Fletcher in the determination that there was no service connection and hence no jurisdiction over the offense alleged in specification 4 of the Charge. However, I am unable to agree with my Brethren in their resolution of the remaining issues. As to those issues, I respectfully dissent.

I

On four separate occasions the appellant sold what purported to be marihuana and lysergic acid diethylamide (LSD) to an undercover agent of the United States Air Force Office of Special Investigations (OSI). After each purchase, the agent gave the purchased item to an OSI evidence custodian. On October 20, 1975, Agent Jackson, the evidence custodian, packaged and mailed the substances to the United States Army Criminal Investigation Division Laboratory at Fort Gordon, Georgia for analysis.[1] Thereafter, on November 19, 1975, similar appearing substances were received by Agent Jackson by mail together with a written laboratory report purporting to have been made or completed by an examining chemist and containing conclusive information that the substances were LSD and marihuana. At the appellant's ensuing court-martial trial on charges alleging that he sold LSD (2 specifications) and marihua-

---

1. The OSI did not have a crime laboratory capable of analyzing narcotics. Therefore, at the time this case arose, the CID laboratory provided laboratory assistance to OSI investigations.

na (2 specifications), the substances purporting to be LSD and marihuana together with the laboratory report were received as evidence. Significantly, no witness testified concerning the receipt and handling of the substances at the CID laboratory at Fort Gordon, Georgia. Moreover, the chemist who performed the crucial analysis and evaluation of the substances and who allegedly caused the findings and conclusions concerning the analysis to be entered in the report, did not testify at the trial. At the trial the alleged narcotic substances were admitted as evidence, contrary to the appellant's objection that the Government had presented no evidence concerning the chain of custody and that, therefore, no connection between the appellant and the evidence was shown. The laboratory report was admitted as evidence without objection by the appellant. The sole evidence identifying the substances as LSD and marihuana was the written laboratory report.

The appellant was convicted of all charges and was sentenced to a bad-conduct discharge, imprisonment for 15 months, forfeiture of all pay and allowances and reduction to the lowest enlisted grade. The United States Air Force Court of Military Review has affirmed. 2 M.J. 331 (1976). We granted review to consider the appellant's contentions (1) that the court erred in admitting the real evidence (the narcotic substances) over his objection that the Government had failed to connect that evidence with him by establishing a complete chain of custody;[2] (2) that the court-martial had no jurisdiction to try the offenses included in two of the specifications (1 and 4) of the charge;[3] and (3) the additional ground, which we specified, concerning whether the laboratory report was admissible, absent the testimony of the examining chemist.[4] My colleagues resolve the first of these issues (the chain of custody issue) by presuming regularity in the receipt, handling, storage and processing of the narcotic substances at the CID laboratory. With respect to the second (jurisdictional) issue, my Brethren are divided, with Judge Cook finding a basis for court-martial jurisdiction over all offenses, while Chief Judge Fletcher finds the absence of service connection and, therefore, no court-martial jurisdiction over the offense charged in specification 4 of the charge. However, with respect to specification 1, Chief Judge Fletcher views the underlying negotiations which occurred on the military base and which led to the off-post transfer of the alleged narcotic substance and payment of money therefor as "a contract to sell" which, in his view, conferred jurisdiction over the off-post transaction. As to the third issue, specified by us, my Brothers join in holding that (a) the laboratory report was properly admitted under the business entry exception to the rule against hearsay evidence, Judge Cook preferring to rest his holding upon that basis in accordance with this Court's decisions in *United States v. Miller*, 23 U.S. C.M.A. 247, 49 C.M.R. 380 (1974), and *United ed States v. Evans*, 21 U.S.C.M.A. 579, 45 C.M.R. 353 (1972), and upon the further ground that the laboratory report was admitted without objection. Chief Judge Fletcher, too, finds solace in *United States v. Miller, supra*, and *United States v. Evans, supra*. My discussion of these issues follows.

II

*Authentication of the Evidence*

At the trial, the Government's witness, Jackson, an OSI agent testified that he served as evidence custodian at Andrews Air Force Base; that on October 20, 1975, he packaged and mailed the narcotic substances to the United States Army Criminal Investigation Division (CID) Laboratory at Fort Gordon, Georgia; and that on November 19, 1975, he received, through the mails,

2. Discussed in Part II, *infra*.

3. Discussed in Part IV, *infra*.

4. Discussed in Part III, *infra*.

a package from that laboratory containing the narcotic substances together with a laboratory report which contained the conclusions of an examining chemist that the narcotic substances were LSD and marihuana. The appellant objected to the admission of the narcotic substances as evidence upon the ground that the Government had failed to properly identify them as the same substances allegedly sold by the appellant. Since no person testified concerning the receipt, custody, handling, analyzing, packaging and transmittal of the evidence back to Agent Jackson during the 31 days between October 20 and November 19, the appellant argued that a complete chain of custody of the evidence from the times they were allegedly received from him until the day they were presented in court was not established and that, therefore, the substances offered as evidence at his trial were not shown to be the same substances allegedly sold by him.[5] The trial judge overruled the objection and admitted the evidence.[6] The laboratory report was admitted as evidence without objection. Notwithstanding our recent decisions in *United States v. Porter*, 7 M.J. 32 (C.M.A.1979); *United States v. Neutze*, 7 M.J. 30 (C.M.A. 1979); and *United States v. Nault*, 4 M.J. 318 (C.M.A.1978), the majority affirms the ruling of the trial judge with respect to the admission of the narcotic substances by presuming regularity in the handling of the evidence while at the CID laboratory at Fort Gordon, Georgia. I decline to join my colleagues in that presumption.

In the trial of criminal cases, items and substances that relate to or explain the issues or tend to prove the occurrence of events are generally admissible as evidence.[7] But to be admissible, the proffered evidence must be shown to be what it is claimed to be through a process known as identification or authentication.[8] Indeed, in

---

**5.** Attached to the plastic bags in which the narcotic substances were enclosed was a completed OSI Form 67 bearing the designation OSI Chain of Custody Receipt. This completed from contains several entries which purport to describe the handling of the evidence at various times between August 26, 1975, to May 20, 1976. The form also contains signatures of various persons, affixed on lines adjacent to the activity reported as having occurred on each day. This proof, regarding the chain of custody, is identical to that which we recently rejected in *United States v. Neutze*, 7 M.J. 30 (C.M.A.1979).

**6.** Each exhibit consisted of a plastic bag containing the narcotic substance. In addition to the chain of custody receipt (*see* n. 5 *supra*), there was affixed to each exhibit an OSI Form 67 bearing the designation "AFOSI EVIDENCE TAG." Each evidence tag contained information which corroborated the government's case against the appellant, as follows:

Prosecution Exhibit 1, a plastic bag containing a bottled substance has an AFOSI Evidence Tag which identifies the contents of the bag as:

"Two pieces of tinfoil containing 9 bits of yellow substance purchased from Amn. Strangstalien for $22.00." The tag also bears the following: "Field Test positive for LSD B&D test kit 'D' lot control # 13."

Prosecution Exhibit 2, a plastic bag containing a bottled substance, has an AFOSI Evidence Tag (Tag 2 of 4 tags, OSI File No. 04D 17–1516, Log Page 18–8) which identified the contents of the bag as: "Two plastic baggies containing suspected marihuana purchased from Amn. Strangstalien for $30.00." The tag also bears the inscription: "Field Test Positive."

Prosecution Exhibit 3, a plastic bag containing a bottled substance, has an AFOSI Evidence Tag (Tag 3 of 4 tags, OSI File No. 04D 17–1516, Log Page 18–10) which identifies the contents of the bag as: "30 orange tablets . . . contained in small piece tinfoil, purchased from Amn. Strangstalien in his room for $60.00." The tag also bears an inscription: "Field test Pos."

Prosecution Exhibit 4, a plastic bag containing a substance, has an AFOSI Evidence Tag (Tag 4 of 4 tags, OSI File No. 04D 17–1516, Log Page 18–13) which identifies the contents of the bag as: "Approx. eight ounces suspected marihuana purchased from Amn Strangstalien for $90.00." This exhibit also has attached an OSI Chain of Custody Receipt bearing entries of October 7, 1975 (storage), October 20, 1975 (Lab analysis), October 24, 1975 (analysis), November 3, 1975 (Transfer): November 10, 1975 (Return to Unit), November 19, 1975 (Storage) and May 20, 1976 (Transfer). The form contains signatures or stamps purporting to identify the individuals who made the entries.

**7.** 29 Am.Jur.2d, Evidence, §§ 744, 844.

**8.** Wigmore, Evidence, § 2129 (3d ed. 1940), treats the question here involved as one not of identification but of authentication. *"Identification* presupposes that two objects, apparent-

criminal prosecutions such as this one, concerning the possession, sale or transfer of narcotic drugs and of other possessory offenses, the identity of the item the accused is alleged to have possessed, transferred or sold is a critical element of the offense which the prosecution must prove beyond a reasonable doubt. Moreover, it is rarely possible to establish the identity of the evidence through the testimony of a single witness since, in the usual case, it will have passed through several hands before being produced in court. In such circumstances, it is necessary to establish a complete chain of custody of the evidence, tracing its possession to the time it is introduced as evidence in court.[9] In *United States v. Nault, supra*, the accused was convicted, *inter alia*, of the possession of LSD. At his trial, the evidence custodian testified that he forwarded the narcotic substance by registered mail to the CID laboratory at Fort Gordon, Georgia, and that upon "receipt of same" by return mail, placed it back in the evidence depository where it remained until it was presented as evidence at the trial. This Court reversed the resultant conviction, holding that the failure to produce a witness who had custody of the evidence during a four-day period was fatal to the government's proof concerning the identity of the narcotic substance as the same substance which had been seized from the accused. We held that[10]

> in-court identification of pills and other fungible items by a competent witness is generally not permitted where the item is neither readily identifiable, marked distinctively, nor possessed of individual characteristics. . . . Generally fungible evidence becomes admissible and material through a showing of continuous custody which preserves the evidence in an unaltered state.

*Id.* at 319 (footnote omitted). Where a defendant objects to evidence on the ground that it has not been properly identified or authenticated by a showing of the continuous custody to which we referred in *United States v. Nault, supra*, the Government may not, in my view, supply the missing link in the chain of custody with a presumption of regularity, thereby shifting to the accused the burden of disproving identity. *United States v. Nault, supra. See also United States v. Starks*, 515 F.2d 112, 122 (3d Cir. 1975); *United States v. Porter, supra; United States v. Neutze, supra.* Indeed, the identity of the evidence as a legally prohibited narcotic substance and the accused's possession and/or sale of that substance were facts concerning which the Government had the burden of proof. *United States v. Verdi*, 5 M.J. 330 (C.M.A. 1978); *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). As the Supreme Court only recently reminded us:

> *Mullaney* surely held that a State must prove every ingredient of an offense beyond a reasonable doubt, and that it may not shift the burden of proof to the defendant by presuming that ingredient upon proof of the other elements of the offense. . . .

*Patterson v. New York*, 432 U.S. 197, 215, 97 S.Ct. 2319, 2330, 53 L.Ed.2d 281 (1977). In my view, the evidence here was inadmissible for the same reasons we held that the evidence was inadmissible in *United States v. Nault, supra. United States v. Neutze, supra; United States v. Porter, supra.* Moreover, as will be demonstrated elsewhere in this opinion,[11] the hearsay evidence which was integrally attached to the

---

ly different, . . . [exist] and the issue is whether they are in fact one and identical, not separate objects. . . . *Authentication* . . . presupposes a single object only, and refers to it as associated with a person, a time, a place, or other known conditions."

9. *See* Comments, "*The Identification of Original, Real Evidence,*" 61 Mil.L.Rev. 145 (1973).

*See also Chain of Custody: Problems in Its Application*, 30 Ark.L.Rev. 344 (1976).

10. *See also United States v. Porter*, 7 M.J. 32 (C.M.A.1979); *United States v. Neutze*, 7 M.J. 30 (C.M.A.1979); *United States v. Zone*, 7 M.J. 21 (C.M.A.1979).

11. *See* Part III, *infra*.

packages of narcotic substances [12] also rendered them inadmissible.

### III

*Admissibility of the Laboratory Report*

#### A

It is axiomatic that admission and consideration of the laboratory report as evidence depends upon proper construction of the rule against hearsay evidence as set forth in the Manual for Courts-Martial, United States, 1969 (Revised edition).[13] Therefore, our inquiry appropriately commences with an examination of the contours of the rule and its applicable exceptions, as set forth in the Manual for Courts-Martial.

(1) Paragraph 139*a* of the Manual provides that hearsay is not competent evidence and that it may not be admitted or considered.[14] Moreover, lest any doubt remain concerning its use or consideration as evidence, the Manual emphasizes: "Hearsay

may not be recited or otherwise introduced in evidence, and it *does not become competent evidence by reason of a mere failure to object to its reception in evidence.*" [15] (Emphasis added). Hearsay evidence is described as any "statement which is offered in evidence to prove the truth of the matters stated therein, but which was not made by the author when a witness before the court." [16] Under the Manual, a "statement" includes "not only an oral or written expression but also non-verbal conduct of a person intended by him as a substitute for words in expressing the matter stated." [17] Confirming the reason for imposing the rule in courts-martial, the President emphasized "the fundamental principle . . . that in a criminal prosecution the testimony of the witnesses shall be taken before the court, so that at the time they give the testimony offered in evidence *they will be sworn and will be subject to cross-examination, the scrutiny of the court and confron-*

12. *See* nn. 5 and 6, *supra.*

13. Article 36(a), Uniform Code of Military Justice, 10 U.S.C. § 836(a), provides:

The procedure, including modes of proof, in cases before courts-martial, . . ., and other military tribunals may be prescribed by the President by regulations which shall, so far as he considers practicable, apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts, but which may not be contrary to or inconsistent with this chapter.

Pursuant to Article 36(a), the President has promulgated paragraph 139 of the Manual for Courts-Martial, United States, 1969 (Revised edition), which provides, *inter alia*, that hearsay is not competent evidence. In paragraphs 140–46, the Manual contains the exceptions to the rule against hearsay. Where, as here, the Manual contains rules concerning the admission of evidence, the Manual is the sole authority concerning the admissibility of evidence in courts-martial.

14. Paragraph 139*a* of the Manual provides:

A statement which is offered in evidence to prove the truth of the matters stated therein, but which was not made by the author when a witness before the court at the hearing in which it is so offered, is hearsay. The word "statement" means not only an oral or written expression but also non-verbal conduct of a person intended by him as a substitute for words in expressing the matter stated. Hear-

say may not be recited or otherwise introduced in evidence, and it does not become competent evidence by reason of a mere failure to object to its reception in evidence. This rule simply means that a fact cannot be proved by showing that someone stated it was a fact. The basis of the rule is the fundamental principle, which is subject to certain well-established exceptions, that in a criminal prosecution the testimony of the witnesses shall be taken before the court, so that at the time they give the testimony offered in evidence they will be sworn and will be subject to cross-examination, the scrutiny of the court, and confrontation by the accused. Hearsay as defined above includes the testimony of a witness given at the hearing that on another occasion he made a certain statement, if that statement is offered to prove the truth of the matters stated and has not been adopted by the witness as a part of his testimony at the hearing.

The fact that a given statement was made may itself be relevant. If this is so, the making of the statement may be shown by any competent evidence, not for the purpose of proving the truth of what was stated but for the purpose of proving the fact that it was stated.

15. *Id.*

16. *Id.*

17. *Id.*

*tation by the accused.*"[18] (Emphasis added). The rule is, of course, subject to certain well established exceptions,[19] one of which the majority finds applicable to this case and which this Court has previously applied in cases similar to this one.[20]

It cannot be disputed that the laboratory report utilized in the instant case is a written "statement" which contains information in the nature of opinions and conclusions of whoever analyzed the narcotic substances.[21] Nor can it be disputed that the statement (the laboratory report) was "offered in evidence to prove the truth of the matters stated therein," namely that the substances allegedly analyzed by the author were indeed LSD and marihuana.[22] Finally, the record confirms that the author of the statement did not make it "when a witness before the court."[23] Thus, the laboratory report is hearsay, both inadmissible and incompetent as evidence under paragraph 139 *a* of the Manual, unless otherwise admissible as is contended by the majority herein.

(2) The majority sustain the admission of the laboratory report under the business entry exception to the rule against hearsay evidence. That exception is set forth in paragraph 144c of the Manual as

> [a]ny writing or record, whether in the form of any entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event is admissible as evidence of the act, transaction, occurrence, or event, if made in the regular course of any business and if it was the regular course of that business to make the memorandum or record at the

time of the act, transaction, occurrence, or event or within a reasonable time thereafter. All other circumstances of the making of the writing or record, including the lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but these circumstances will not affect its admissibility. The term "business" as used with respect to business entries, includes a business, profession, occupation, or calling of any kind.[24]

To be admissible under the business entry exception and thus escape the strictures of the rule against hearsay, paragraph 144c makes clear that the statement must have been a

> writing or record, . . . made as a memorandum or record of any act, transaction, occurrence, or event . . . if made in the regular course of . . . business and if it was the regular course of that business to make the memorandum or record at the time of the act, transaction, occurrence, or event.

According to the *Georgetown Law Journal* :[25] "Underlying the [business entry exception] to the hearsay rule is the trust placed in trained reporters to record relatively simple transactions. . . . The admission of business records is posited on a belief in the reliability of regular entries [26] made close in time to the events recorded,[27] by trained scribes who are presently unavailable."[28] 56 Georgetown L.J. 939, 943–45 (1968). But admissibility as evidence under the business entry exception depends

---

18. *Id.*

19. The exceptions to the rule against hearsay are set forth in paragraphs 140–46, Manual, *supra.*

20. *See United States v. Miller,* 23 U.S.C.M.A. 247, 49 C.M.R. 380 (1974); *United States v. Evans,* 21 U.S.C.M.A. 579, 45 C.M.R. 353 (1972).

21. *See* para. 139a, Manual, *supra.*

22. *Id.*

23. *Id.*

24. Para. 144c, Manual, *supra.*

25. Note, *Confrontation, Cross-Examination and the Right to Prepare a Defense,* 56 Georgetown L.J. 939 (1968).

26. *See Loper v. Morrison,* 23 Cal.2d 600, 608, 145 P.2d 1, 5 (1944).

27. *Yates v. Helms,* 154 So.2d 731, 733 (Fla.App. 1963).

28. *Keller v. Wonn,* 140 W.Va. 860, 870, 87 S.E.2d 453, 460 (1955).

upon the nature of the record and the purpose for which it was made.[29]

(3) Examination of the nature of the business of the laboratory is necessary to any determination of the admissibility of its reports. As the record of trial is silent in that respect, we must look to the regulations under which this laboratory functions.

Under Army Regulations effective on the dates included in the specifications in this case, the United States Army Criminal Investigation Laboratory was an integral part of the United States Army's Criminal Investigation Program, the purpose of which is set forth in the regulations, *inter alia*, as "[i]nsuring that known or suspected serious crimes and crimes which may result in damaging the public confidence in the Army are thoroughly and impartially investigated by CID special agents."[30] The regulations provide that "[t]he Commanding General of the United States Army Criminal Investigation Command (USACIDC), a major Army command, is responsible for exercising command, authority, direction, and control of Army criminal investigative activities

worldwide."[31] Also, "Major Army commanders and major Army subordinate commanders" are required "[w]ithin their respective areas of responsibility" to "insure that known or suspected criminal activity is reported to the military police and, when appropriate, to CID for investigation."[32] Moreover, "[c]ommanders and supervisors of all elements of USACIDC are assigned the mission of providing criminal investigative services to the U.S. Army on an area basis."[33] All Army CID elements are required to adopt operational procedures which, in addition to that previously stated,[34] accomplish the stated goal of "[p]articipating in the Army crime prevention program by identifying areas which are especially vulnerable to crime and by making recommendations to appropriate authorities for elimination of conditions conducive to criminal activity,"[35] and of "[p]romptly informing appropriate authorities of facts uncovered during criminal investigations and crime prevention activities and preparing and submitting required reports."[36] All "[s]erious crimes" must be "reported to and

**29.** *See* n. 25, *supra.* The author lists three types of written statements which are generally admissible under this exception.

"The first is comprised of occurrences which can only be proved by the record itself," including corporate acts necessarily "in writing. *See,* e. g. *Yonda v. Royal Neighbors,* 96 Neb. 730, 148 N.W. 926 (1914) (original of corporate by-laws required as proof)." The author views those "documents [as] not evidence of anything else, but [as] 'constitutive acts,' [*see* 5 Wigmore, Evidence §§ 1660–61 (3d ed. 1940)] and . . . involve no confrontation problem." Since that document, as "a 'constitutive act,' is not a witness against the accused," no confrontation problems exists. *See State v. Kelly,* 52 Wash.2d 676, 681–82, 328 P.2d 362, 365–66 (1958). [56 Georgetown L.J. at 943–44].

The *second* type consists of "[r]ecords which are routine in nature and require largely mechanical skills," including "for example, birth, death, and marriage certificates. *E. g., United States v. Austrew,* 202 F.Supp. 816 (D.Md. 1962), *affd.,* 317 F.2d 926 (4th Cir. 1963) (birth *certificate*)." Courts recognize that because "of their simplicity, such records are generally reliable." *Dowdell v. United States,* 221 U.S. 325, [31 S.Ct. 590, 55 L.Ed. 753] (1911) "(certificate of trial court)"; *United States v. Austrew, supra; Gibbs v. State,* 169 Tex.Crim. [R.] 608, 336 S.W.2d 625 (1960) "(fingerprints)"; *People*

*v. Ziebell,* 82 Ill.App.2d 350, 227 N.E.2d 127 (1967) "(certificate of weighmaster)." [56 Georgetown L.J. at 944].

*Third* is the category of reports of "investigations in which the recorder has discretion to make inferences and draw conclusions." Reports included in this class are generally held inadmissible. These are "evaluative reports" and they are generally excluded because of the rule against opinion evidence, "which excludes testimony as to inferences that a jury is capable of making. *Franklin v. Skelly Oil Co.,* 141 F.2d 568 (10th Cir. 1944)." [56 Georgetown L.J. at 944].

**30.** Para. 5*a,* AR 195–1 (Effective 1 October 1974). This regulation was amended May 6, 1977, and the amendments became effective July 1, 1977.

**31.** Para. 3*a, supra.*

**32.** Para. 3*b, supra.*

**33.** Para. 4, *supra.*

**34.** *See* text at n. 30, *supra.*

**35.** Para. 5*b, supra.*

**36.** Para. 5*c, supra.*

investigated by CID personnel."[37] Included is the requirement of investigation of offenses involving "controlled substances" (narcotics, marihuana or dangerous drugs, or other items so defined).[38] The United States Army Criminal Investigation Command provides "centralized criminal investigative support to major and major subordinate commanders worldwide."[39]

Under announced policies existing when this case arose, the United States Army Criminal Investigative Laboratory System was and is now an activity of the U.S. Army Criminal Investigation Command.[40] The CID Laboratory system is required to give "scientific, *forensic*, and investigative assistance and support to USACIDC, provost marshals, and other DOD [Department of Defense] and Federal law enforcement agencies worldwide."[41] Additionally, the laboratory system "trains selected [criminal investigators] and civilian personnel as laboratory technicians and examiners."[42] Like other elements of the CID system, the commanding officers of criminal investigation laboratories are responsible for accomplishing the mission of laboratories, complying with policies established by the Commander, USACIDC.[43] Thus, the United States Army Criminal Investigation Command is the Army's principal law enforcement agency. And, integrally included in the program under a single command is the United States Army Criminal Investigation Laboratory System whose principal mission is to provide "scientific, forensic and investigative assistance" to those persons and agencies set forth in the regulations, including other U.S. Army CID elements.[44]

The United States Air Force, which investigated and prosecuted this case, has a law enforcement agency, the Office of Special Investigations (OSI), which performs functions similar to those which the CID performs for the Army.[45] However, the OSI did not, at the time this case arose, have its own laboratory facility. Therefore, as a DOD investigative agency,[46] OSI, in investigations requiring chemical analysis, utilized the United States Army Criminal Investigation Laboratory System.

It may not be gainsaid that the CID is a law enforcement agency not unlike the Federal Bureau of Investigation.

(4) Paragraph 144*d* of the Manual imposes telling limitations upon the admissibility of business entries by providing that "[r]ecords or entries of 'opinion' are not admissible" unless the author of the opinion testifies and is subject to cross-examination.[47] A further limitation exists in this admonition:

> Neither the official record nor the business entry, exception to the hearsay rule renders admissible in evidence writings or records made principally with a view to prosecution, or other disciplinary or legal action, as a record of, or during the course of an investigation into, alleged unlawful or improper conduct.[48]

In my view, the statement of a chemist concerning the result of a chemical analysis is an expression of opinion. Therefore, admission of the laboratory report absent the testimony of the chemist was prohibited by the Manual.[49]

37. Para. 6*b*, *supra.*

38. Paras. 3–1*c*, and 1–3*g*, AR 195–2, 23 August 1974.

39. Para. 2–1*a*, *supra.*

40. *Para.* 6–1, *supra.*

41. *Id.* [Forensic means belonging to courts of justice, according to Black's Law Dictionary, revised 4th ed. (1968)].

42. *Id.*

43. Para. 6–2a, *supra.*

44. Para. 6–1, *supra.*

45. *See* para. 3b, AFR 23–18 (25 Oct. 74), which tasks the OSI with investigating offenses within the Air Force including: "(1)(a) Arson, bribery; homicide; counterfeiting; sodomy, rape and other sex offenses; impersonation; improper use or diversion of Government property or employees; forgery; robbery; housebreaking; drug abuse; and other violations of the Uniform Code of Military Justice, or other Federal laws and directives."

46. *See* test at n. 41, *supra.*

47. Para. 144*d*, *supra.*

48. *Id.*

49. *See* text at n. 47, *supra.*

Moreover, the Army Criminal Investigative Laboratory is an integral part of the United States Army Criminal Investigation Program.[50] The laboratory is required to give scientific, forensic and investigative assistance and support to U.S. Army CID elements, provost marshals and other DOD and federal law enforcement agencies worldwide.[51] It can hardly be disputed, therefore, that the laboratory report in this case which presumably originated at the CID laboratory was prepared for a *forensic* use during the appellant's court-martial.

The purpose for which the laboratory report was prepared is no different from that which the court condemned in *Palmer v. Hoffman*, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943), where a railroad engineer's written statement, made subsequent to an accident in accordance with company policy, to representatives of the railroad and the Massachusetts Public Utilities Commission, was held not admissible under the

Federal Business Records Act. 18 U.S.C. § 1732. In ruling the statement inadmissible the Court observed that " 'regular course' of business must find its meaning in the inherent nature of the business in question and in the methods systematically employed for the conduct of the business as a business." *Id.* at 115, 63 S.Ct. at 481. The reports which contained the engineer's statement were not made for the systematic conduct of the enterprise as a railroad business. Said the Court, "Unlike payrolls, accounts receivable, accounts payable, bills of lading and the like these reports are calculated for use essentially in the court, not in the business. Their primary utility is in litigating, not in railroading." [52] *Id.* at 114, 63 S.Ct. at 481.

(5) Review of the Federal Rules of Evidence and the legislative history leading to their enactment by the Congress convinces me that, even if applicable to trials by courts-martial,[53–55] they do not support the

---

**50.** *See* text at nn. 30–44, *supra.*

**51.** *See* text at n. 41.

**52.** *Palmer v. Hoffman*, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943). *See also Lewis v. Baker*, 526 F.2d 470 (2d Cir. 1975); *United States v. Bonds*, 526 F.2d 331 (5th Cir. 1976). Of particular interest is the treatment accorded this subject in *United States v. Oates*, 560 F.2d 45 (2d Cir. 1977), where the court pointedly refused to hold a laboratory report admissible under FRE 803(6) as a business record. Said the court:

If we were to construe FRE 803(6) in an overly literal fashion and find that the chemist's report and worksheet constituted "business records" under that rule, the collision [between the Rule and the Confrontation Clause of the Constitution] which the Congress so assiduously tried to "avoid inviting" would be that much nearer to occurring. *Id.* at 80. *See also United States v. Yates*, 173 U.S.App.D.C. 308, 524 F.2d 1282 (1975). When a document is made for something other than a regular business purpose, it does not fall within the business entry exception to the rule against hearsay. *See United States v. Kim*, 194 U.S. App.D.C. ——, 595 F.2d 755 (1979); *Seattle First Nat. Bank v. Randall*, 532 F.2d 1291, 1296 (9th Cir. 1976); *Hiram Ricker and Sons v. Students International Meditation Society*, 501 F.2d 550, 554 (1st Cir. 1974); *Colvin v. United States*, 479 F.2d 998, 1003 (9th Cir. 1973); *United States v. Middlebrooks*, 431 F.2d 299, 302 (5th Cir. 1970), *cert. denied*, 400 U.S. 1009, 91 S.Ct. 569, 27 L.Ed.2d 622 (1971); *Colorificio*

*Italiano Max Meyer, SPA v. S/S Hellenic Wave*, 419 F.2d 223, 225 (5th Cir. 1969); *Thomas v. Hogan*, 308 F.2d 355, 358 (4th Cir. 1962); *Gass v. United States*, 135 U.S.App.D.C. 11, 16, 416 F.2d 767, 772 (1969); *Standard Oil Co. of Cal. v. Moore*, 251 F.2d 188, 213 (9th Cir. 1957), *cert. denied*, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148, (1958); *United States v. Rappy*, 157 F.2d 964, 966 (2d Cir. 1946); *United States v. Plisco*, 192 F.Supp. 337, 338 (D.D.C.1961), *aff'd*, 113 U.S.App.D.C. 177, 306 F.2d 784 (1962), *cert. denied*, 371 U.S. 948, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963); *Gilmour v. Strescon Industries, Inc.*, 66 F.R.D. 146, 150 (E.D.Pa., *aff'd*, 521 F.2d 1398 (3rd Cir. 1975).

**53.** *See* FRE 1101(a) which provides as follows:
These rules apply to the United States district courts, the District Court of Guam, the District Court of the Virgin Islands, the District Court for the District of the Canal Zone, the United States courts of appeals, the Court of Claims, and to United States magistrates, in the actions, cases, and proceedings and to the extent hereinafter set forth. The term "judge" and "court" in these rules include United States magistrates, referees in bankruptcy, and commissioners of the Court of Claims.

**54.** *See* text at n. 13, *supra.*

**55.** As of this writing, a committee is in the process of reviewing the Federal Rules of Evidence to determine their suitability for use in courts-martial. The committee is made up of representatives of the General Counsel of the

admission of the laboratory report in this case as evidence. That legislative history has been fully reviewed in an opinion by the United States Court of Appeals for the Second Circuit in *United States v. Oates,* 560 F.2d 45 (2d Cir. 1977), and need not be set forth here in the detail utilized by that Court. However, summarizing the legislative history of the Rules of Evidence as they reflect upon the admissibility of laboratory reports, the Court observed: [56]

> Representative William Hungate, in presenting the report of the Committee of Conference to the House of Representatives, left no doubt that it was the belief of the Committee of Conference that under the new Federal Rules of Evidence the *effect* of FRE 803(8)(B)(C) was to render law enforcement and evaluative reports inadmissible against defendants in criminal cases. It is thus clear that the only way to construe FRE 803(6) so that it is reconcilable with this intended effect is to interpret FRE 803(6) and the other hearsay exceptions in such a way that police and evaluative reports not satisfying the standards of FRE 803(8)(B) and (C) may not qualify for admission under FRE 803(6) or any of the other exceptions to the hearsay rule. That Congress must have understood that all the hearsay exceptions would be construed in light of the carefully drafted proscriptions of FRE 803(8) is also demonstrated, . . by Representative Dennis' categorical remarks to that effect.

Observing that the rules of statutory construction clearly warrant construing FRE 803(6) to exclude the laboratory report, the Court stated: [57]

Beyond Representative Hungate's explicit statement of the legislation's meaning and Representative Dennis' graphic affirmation of that explanation, there is . . abundant evidence of legislative purpose regarding Article VIII in general and FRE 803 in particular. An examination of this information convinces us that when there is tension between the confrontation clause of the Sixth Amendment to the United States Constitution and the literal language of the various hearsay exceptions it was the Congressional intent that a less literal reading of the rules would be justified.

As explained earlier, both the Advisory Committee and the Congress were preoccupied with "avoid[ing] inviting collisions" between the hearsay rule and the confrontation clause. This intense desire to avoid creating tensions between the two was articulated in the Advisory Committee's Notes, *see* Advisory Committee's Notes, Introductory Note to Article VIII and Note to Paragraph (8) of Rule 803, 56 F.R.D. at 292, 313, and in the House debates, see e. g., 120 Cong.Rec. 2387–88 (1974), and was acted upon in Congress by the excision of the Senate's then proposed Rule 804(b)(5) from the pending legislation, see H.R.Rep.No. 1597, 93d Cong., 2d Sess. 12 (1974), and by approval of the Dennis amendment to FRE 803(8)(B), *see* 120 Cong.Rec. 2389 (1974), the Advisory Committee's language in FRE 803(8)(C) and the prefatory language of FRE 803 and 804. In particular, the novelty of the prefatory language applicable to FRE 803(6) ("the following are not excluded by the hearsay rule") is best appreciated by recalling that this rule's predecessor, 28 U.S.C. § 1732, did

---

Department of Defense, the Judge Advocate General, the Chief Counsel of the United States Coast Guard, and of this Court. Ultimately, the committee's recommendations will be submitted to the President as suggested amendments to the Manual for Courts-Martial pursu-

ant to the President's rule making powers under Article 36, *supra.*

**56.** 560 F.2d at 77.

**57.** *Id.* at 78–79.

not merely make evidence meeting its requirements "not exclud[able] by the hearsay rule" but rather made that evidence immediately admissible upon its qualifying as a "business record" under § 1732. It was thus with great solicitude for a criminal defendant's right to confront his accusers that the current hearsay exceptions were drafted and adopted.

My reading of the legislative history of the Federal Rules of Evidence convinces me that the conclusions of the Second Circuit in *United States v. Oates, supra,* are fully supported by law and logic, and that not even FRE 803(6) supports admission of the laboratory report in this case.

(6) As above noted, the Manual for Courts-Martial recognizes

the fundamental principle . . . that in a criminal prosecution the testimony of the witnesses shall be taken before the court, so that at the time they give the testimony offered in evidence they will be sworn and will be subject to cross-examination, the scrutiny of the court, and confrontation by the accused.[58]

The fundamental nature of that principle can hardly be gainsaid, for it is embedded firmly in the Sixth Amendment to the Constitution of the United States.

More than 80 years ago, the Supreme Court stated:

The primary object of the [confrontation clause of the Sixth Amendment] was to prevent depositions or *ex parte* affidavits, . . . being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.

*Mattox v. United States,* 156 U.S. 237, 242–43, 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895);

see *Barber v. Page,* 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968). The Supreme Court has never viewed the purpose of the Sixth Amendment differently. Later, in extending the Sixth Amendment's protections to defendants in state prosecutions through the Fourteenth Amendment, the Court observed:

There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal.

*Pointer v. Texas,* 380 U.S. 400, 405, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965). See *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); *Diaz v. United States,* 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500 (1912). A classic statement of the "fundamental" right of confrontation was made by Mr. Justice Black in *Pointer v. Texas, supra,* 380 U.S. at 404–05, 85 S.Ct. at 1068 (footnote omitted):

It cannot seriously be doubted at this late date that the right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him. And probably no one, certainly no one experienced in the trial of lawsuits, would deny the value of cross-examination in exposing falsehood and bringing out the truth in the trial of a criminal case. See, e. g., 5 Wigmore, Evidence § 1367 (3d ed. 1940). The fact that this right appears in the Sixth Amendment of our Bill of Rights reflects the belief of the Framers of those liberties and safeguards that confrontation was a fundamental right essential to a fair trial in a criminal prosecution. Moreover, the decisions of this Court and other courts throughout the years have constantly emphasized the necessity for cross-examination as a protection for defendants in criminal cases. This Court in *Kirby v. United States,* 174 U.S. 47, 55, 56, 19 S.Ct. 574, 577, 43 L.Ed. 890 re-

---

58. *See* text at n. 18, *supra.*

ferred to the right of confrontation as "[o]ne of the fundamental guaranties of life and liberty," and "a right long deemed so essential for the due protection of life and liberty that it is guarded against legislative and judicial action by provisions in the constitution of the United States and in the constitutions of most, if not all, the states composing the Union." Mr. Justice Stone, writing for the Court in *Alford v. United States*, 282 U.S. 687, 692, 51 S.Ct. 218, 219, 75 L.Ed. 624, declared that the right of cross-examination is "one of the safeguards essential to a fair trial." And in speaking of confrontation and cross-examination this Court said in *Greene v. McElroy*, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377.

"They have ancient roots. They find expression in the Sixth Amendment which provides that in all criminal cases the accused shall enjoy the right 'to be confronted with the witnesses against him.' This Court has been zealous to protect these rights from erosion." 360 U.S. at 496–497, 79 S.Ct. [1400] at 1413 (footnote omitted).

More recently, the Supreme Court, while emphasizing the necessity of complying with the Sixth Amendment's command, stated:

It is sufficient to note that the particular vice that gave impetus to the confrontation claim was the practice of trying defendants on "evidence" which consisted solely of *ex parte* affidavits or depositions . . . , thus denying the defendant the opportunity to challenge his accuser in a face-to-face encounter in front of the trier of fact.

*California v. Green*, 399 U.S. 149, 156, 90 S.Ct. 1930, 1934, 26 L.Ed.2d 489 (1970). In *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the Supreme Court again emphasized the right of cross-examination as essential to the right of confrontation. Said the Court (*id.* at 315–16, 94 S.Ct. at 1110):

"Our cases construing the [confrontation clause] hold that a primary interest secured by it is the right of cross-examination." . . .

Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, *i. e.,* discredit, the witness.

No one has suggested, nor could they, that the men and women of the armed services of the United States do not enjoy this basic right when accused before courts-martial of having committed criminal offenses. Indeed, the President of the United States has recognized the right of confrontation as a part of the *fundamental* law of the land and has declared its application to courts-martial. Para. 139a, Manual, *supra.* This Court, too, has, on more than one occasion, recognized its existence and its vitality. *See United States v. Williams* 16 U.S.C.M.A. 210, 36 C.M.R. 366 (1966); *United States v. Jacoby*, 11 U.S.C.M.A. 428, 29 C.M.R. 244 (1960). Thus, it is clear that both the Constitution of the United States and the Manual for Courts-Martial protect the right of the accused in a court-martial to be confronted by the witnesses against him. This fundamental right includes the right to have the government's witnesses' testimony taken before and scrutinized by the jury and subject to cross-examination by the accused. Evidence against an accused which does not conform to this fundamental principle is inadmissible.

**B**

Observing that, in this case, the Court does not write upon a "clean slate," the majority cites and places reliance upon *United States v. Evans*, 21 U.S.C.M.A. 579, 45 C.M.R. 353 (1972), and *United States v. Miller*, 23 U.S.C.M.A. 247, 49 C.M.R. 380 (1974), in which this Court approved the admission of laboratory reports in cases similar to this one under the business entry

exception to the rule against hearsay evidence. Those cases do support the result reached by the majority and I would join them if the conclusions reached in those cases were sound. However, while those cases were unanimously decided and constitute the views of the distinguished Judges who decided them, they are at variance with the current weight of authority and, indeed, the fundamental law of the land. I, therefore, urge my colleagues to overrule both cases and permit the men and women of the armed services who are charged with crime to enjoy the protections given them in the Manual for Courts-Martial and guaranteed them under the Constitution of the United States.

### (1) United States v. Evans

In *Evans*, the Court affirmed a conviction of the offense of possession of lysergic acid diethylamide (LSD) which rested, *inter alia*, upon a written report, made at the North Carolina State Bureau of Investigation, which declared that 300 small white tablets, seized from the accused and submitted by mail to the laboratory, "had been analyzed and found to contain 'the hallucinogenic drug, Lysergic Acid Diethylamide, commonly known as LSD.'" *Id.* at 580, 45 C.M.R. at 354. As in the instant case, the examining chemist, presumably associated with the laboratory, did not appear and testify at the trial. Declaring the laboratory report admissible under the business entry exception to the rule against hearsay evidence, this Court explained its *ratio decidendi* as follows: (a) The accused failed to object that the report was not authenticated and therefore waived the right to challenge authentication on appeal, citing paragraph

143*b* of the Manual for Courts-Martial and *United States v. Castillo*, 1 U.S.C.M.A. 352, 3 C.M.R. 86 (1952); [59] (b) the court took judicial notice "that a 'crime laboratory' is a place in which scientific methods and principles are applied in the testing and analysis of various items in connection with the detection and prosecution of crimes," citing Webster's Third New International Dictionary, 1963, Unabridged edition, page 1260.[60] (No evidence, however, concerning the activities of the North Carolina Bureau of Investigation Laboratory was alluded to by the Court. Nor was any mention made by the Court concerning the methods used by the examiner to reach the results declared in the report. The opinion is silent as to the professional training of the examining chemist or of any of the factors relating to the reliability of the analysis which might have been ascertained if the accused had been privileged to cross-examine him); (c) the Court stated:

"Obviously, the regular course of the laboratory's business is to record the results of its analysis and make its report to those concerned," [61] *id.* at 581, 45 C.M.R. at 355; (d) the Court announced that chemical examiners employed by crime laboratories do "no more than seek to establish an intrinsically neutral fact, the identity of the substance itself," [62] *id.* at 582, 45 C.M.R. at 356; (e) finally, the Court announced that if the accused "wishes to do so, he may have the analyst summoned and 'attack the regularity of the test procedure and the competency of the . . . [person] who ran the test . . . . But these factors . . "go to the weight of the evidence rather than to (its) initial admissibility,"'" citing

**59.** Para. 143*b* of the Manual provides in pertinent part:

A writing that is not authenticated may not be introduced in evidence as being genuine, but authentication can be waived by a failure to object on the ground of lack of proof of authenticity to the reception in evidence of the writing. A mere failure to object on this ground to the reception in evidence of a writing, however, will add nothing to the evidentiary nature of the writing. For example, *it*

*will not render a writing competent if it would not otherwise be admissible for the purpose of proving the truth of the matters stated therein, such as a writing which is hearsay and not within any of the exceptions to the hearsay rule. See* 139*a.* (Emphasis added).

**60.** *United States v. Evans, supra* at 581, 45 C.M.R. at 355.

**61.** *Id.*

**62.** *Id.* at 582, 45 C.M.R. at 356.

*Thomas v. Hogan,* 308 F.2d 355, 361 (4th Cir. 1962).[63]

As above noted, the *Evans* court concluded that the failure of the accused to object that the report was not authenticated, constituted a waiver of his right to challenge authentication on appeal. But by resting its ruling upon the authentication procedure of paragraph 143*b* of the Manual, the Court ignored the plain and unambiguous declaration of paragraph 139: "Hearsay may not be recited or otherwise introduced in evidence, and it does not become competent evidence by reason of a mere failure to object to its reception in evidence." [64] By approving admission of the laboratory report absent the testimony of the examining chemist, the Court permitted the Government to accomplish by indirection that which was otherwise specifically prohibited by the President.[65]

By taking judicial notice concerning the activities pursued at crime laboratories, the Court further reduced the Government's burden of proof and tacitly relieved the Government of the initial requirement of proving the reliability and truthworthiness of the information contained in the report. Indeed, the Government was also relieved of the initial burden of establishing the professional qualifications of the examining chemist and of other matters such as the procedures used in analyzing the substance in that case in order that the fact finders could determine the professional qualifications and credibility of the chemical analyst.[66] *See* para. 138*e*, Manual, *supra.*

Without support in the record, the *Evans* Court stated: "Obviously, the regular course of the laboratory's business is to record the results of its analysis and make its report to those concerned." But, taking the Court's definition of crime laboratory, the business of the North Carolina State Bureau of Investigation Laboratory would have been the "testing and analysis of various items in connection with the detection and prosecution of crimes." [67] The principal business, therefore, was that of "testing and analysis" and of giving evidence in court concerning those findings. The rendering of reports and the giving of evidence in court, however, do not constitute the systematic conduct of the enterprise as a laboratory. The Supreme Court's observation in *Palmer v. Hoffman, supra,* 318 U.S. at 114, 63 S.Ct. at 481, thus becomes pertinent: "Unlike payrolls, accounts receivable, accounts payable, bills of lading and the like these reports are calculated for use essentially in the court, not in the business. Their primary utility is in litigating . . ." The *Evans* Court clearly ignored established principles concerning the type of records usually associated with the systematic conduct of a business. " '[R]egular course' of business must find its meaning in the inherent nature of the business in question and in the methods systematically employed for

---

**63.** *Id.* It should be noted that the observation that the accused may have the analyst summoned as a witness operates to comply only with the provision of the Sixth Amendment which provides that " . . . the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor . . ." It cannot be said that the Court gave credence to the accused's right "to be confronted with the witnesses against him."

**64.** *See* n. 14, *supra.*

**65.** *Id.*

**66.** *See* para. 138*e*, Manual, *supra,* which provides, *inter alia*:

An expert witness—that is, one who is skilled in some art, trade, profession, or science or who has had specialized training or experience in relation to matters which are not generally within the knowledge of men or common education and experience—may express an opinion on a matter which is within his specialty and which is involved in the inquiry. *Before being permitted to express his opinion, it should be shown that he is an expert in the specialty.* A showing of expert qualifications may be waived, however, either expressly or by a failure to object on the ground of a lack of such a showing to the reception in evidence of testimony of an expert nature. (Emphasis added).

**67.** *United States v. Evans, supra* at 581, 45 C.M.R. at 355.

the conduct of the business as a business." *Palmer v. Hoffman, supra* at 115, 63 S.Ct. at 481. As the report in *Evans* was prepared "in connection with the detection and prosecution of crimes" and had no relationship to the systematic conduct of the business of the laboratory, such as that of "payrolls, accounts receivable, accounts payable, bills of lading and the like" its "primary utility is in litigating." *Palmer v. Hoffman, supra*, 318 U.S. at 114, 63 S.Ct. at 481. Admission of the report as evidence was, therefore, prohibited under paragraph 144*d* of the Manual.[68]

Without citation of authority, the Court announced that chemical examiners employed by crime laboratories do "no more than seek to establish an intrinsically neutral fact, the identity of the substance itself." 21 U.S.C.M.A. at 582, 45 C.M.R. at 356. But the Court ignored the fundamental proposition that the identity of the substance in a case such as this is an essential element of the government's burden of proof which must be established by proof beyond a reasonable doubt. The Supreme Court of the United States has "held that at a matter of *due process* the prosecution bears the burden of proving beyond a rea-

sonable doubt 'the existence of every fact necessary to constitute the crime charged.' *Davis v. United States*, 160 U.S. 469, 498, 16 S.Ct. 353, 40 L.Ed. 499 (1895)." *In re Winship, supra* 397 U.S. at 363, 90 S.Ct. 1068; *United States v. Verdi, supra* at 335–36. The establishment of the identity of a prohibited substance in a narcotics prosecution is not a "neutral fact." It is an essential part of the Government's burden of proof. The plea of not guilty had the effect of placing upon the Government the burden to prove each and every element of the offense charged, including the identity of the prohibited substance as a narcotic. It was the defendant's "fundamental" right to have the person who performed the analysis testify before the court so that he or she may be sworn and subjected to cross-examination, the scrutiny of the court, and confrontation by the accused.[69]

The *Evans* Court attempted to satisfy the accused's right of confrontation by declaring that if the accused "wishes to do so, he may have the analyst summoned and 'attack the regularity of the test procedure and the competency of the . . . [person] who ran the test. . . . But these factors . . . "go to the weight of the

68. *See* n. 47, *supra.*

69. *See* n. 14, *supra*, and accompanying text. In this regard, the accused might wish to test, and the courts should be interested in knowing the methods and the accuracy of the test procedures utilized by the laboratory in arriving at the conclusions in the case on trial. It is known that serious questions concerning the accuracy of testing procedures in some crime laboratories have been raised by a report of the work of the Laboratory Proficiency Testing Program. The program, sponsored jointly by the National Institute of Law Enforcement and Criminal Justice, the Law Enforcement Assistance Administration, and the United States Department of Justice, began in the fall of 1974, with from 235 to 240 crime laboratories throughout the United States participating. *See* Imwinkelried, *The Constitutionality of Introducing Evaluative Laboratory Reports Against Criminal Defendants*, 30 Hastings L.J. 621 (1979). The author notes that to test the accuracy of these crime laboratories, the Project Advisory Committee prepared samples and submitted them to the laboratories for evaluation.

The report's findings are alarming. In Test # 3, the Committee submitted blood for analysis. Of the laboratories typing for the MN system, only 60% reached the correct conclusion. In Test # 6, the Committee submitted drugs for evaluation. One hundred seventy-nine laboratories participated in the test. Only 70.4% correctly concluded that the mixture included cocaine. In Test # 8, the Committee again submitted blood for analysis. In this test, one question was whether two bloodstains could have shared a common origin. Only 37.4% of the laboratories reached the correct conclusion. Test # 9 was similar to Test # 8; the Committee submitted glass for common origin testing. . . . [O]nly 69.6% of the participating laboratories reached the correct finding. Test # 10 involved the submission of paint samples for common—origin testing. Only 50% of the participating laboratories reported correct test results. In Test # 13, the Committee submitted physiological fluid for analysis. Only 18% of the participating laboratories correctly reported a conclusive finding that the fluid was saliva. *Id.* at 636–37.

evidence rather than to (its) initial admissibility." ' " [70] The Court thus shifted the burden to the accused to disprove the identity of the substance as a narcotic by requiring the accused to have the analyst summoned if he "wishes." For that proposition the Court cited *Thomas v. Hogan, supra,* a civil case in which the Court of Appeals for the Fourth Circuit held that a trial court committed error when it refused the defendant's effort to introduce a blood test showing the plaintiff's alcohol content. The Court held that the test was properly admissible under the federal shop book statute, 28 U.S.C. § 1732, under a presumption of trustworthiness. The Court held that, on retrial of the case, the plaintiff may attack the regularity of the test procedure and the competency of the person who ran the test. But *Thomas v. Hogan, supra,* was a *civil* case which did not involve the application of a provision such as paragraph 139*a,* Manual, *supra,* which provides, *inter alia* : [71]

> The basis of the rule is the fundamental principle . . . that *in a criminal prosecution* the testimony of the witnesses shall be taken before the court, so that at the time they give [their] testimony offered in evidence they will be sworn and will be subject to cross-examination, the scrutiny of the court, and confrontation by the accused.

Thus, it is obvious that the authorities upon which the *Evans* Court based its conclusions do not in fact support them. The holding in *Evans* is contrary to the provisions of paragraphs 139 [72] and 144*d,*[73] Manual, *supra,* in that *Evans* sanctions the use, in a criminal prosecution, of a hearsay statement prepared for use in court during the

criminal trial,[74] based upon the opinions and evaluations of an individual who was not "sworn and . . . subject to cross-examination, the scrutiny of the court, and confrontation by the accused." [75]

### (2) *United States v. Miller*

In *Miller,* a case certified by the Judge Advocate General of the Army, the Court reversed a decision of the Court of Military Review and reinstated the accused's conviction of possession of marihuana which rested, *inter alia,* upon the admission of a laboratory report purporting to identify the substance seized from the accused's person as marihuana. As in both *Evans* and this case, the laboratory report was the sole evidence purporting to identify the substance which precipitated the prosecution as marihuana. This Court, on the basis of its holdings in *United States v. Evans, supra,* held that the laboratory report was properly admissible under the business entry exception to the rule against hearsay evidence.[76] The Court further recognized: "Indisputably, the 'right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal.' . . ." 23 U.S.C.M.A. at 248, 49 C.M.R. at 381. And, relying upon *United States v. Leathers,* 135 F.2d 507, 511 (2d Cir. 1943), the Court stated that "the admission into evidence of a business entry, without in-court testimony by the person having knowledge of the recorded fact, does not" violate the Sixth Amendment.[77]

Careful inspection of *United States v. Leathers, supra,* will reveal no support for the above-quoted language. In *Leathers,*

---

**70.** *United States v. Evans, supra* at 582, 45 C.M.R. at 356. *See also* n. 63, *supra,* and accompanying text.

**71.** *See* n. 14, *supra.*

**72.** *Id.*

**73.** *See* text at nn. 47, 48, *supra.*

**74.** *See* text at n. 60, *supra.*

**75.** *See* text at n. 14, *supra. See also* the discussion in part III A(6).

**76.** *United States v. Miller, supra* at 248, 249, 49 C.M.R. at 381–82. The *Miller* Court tacitly adopted the rationale of *Evans,* including the holding that it was the business of the (North Carolina Law Investigation) Laboratory to file reports. But *Miller* involved a Criminal Investigative Laboratory whose regulations prescribe its business as that of providing "scientific, forensic, and investigative assistance" to other CID elements.

**77.** *Id.*

the Court affirmed convictions of two men convicted of mail fraud and of conspiring to commit those offenses. During the trial the court permitted the Government to introduce several items of evidence, including a collection letter sent by the Illinois National Bank of Springfield to the First National Bank of New York containing many checks for collection and including the five checks set forth in the first count of the indictment, which had been obtained from the victim. The Government also introduced other collection letters and checks. Witnesses employed by the several banks testified, *inter alia,* concerning the "ordinary course" of the conduct of bank business and the procedures utilized in handling collections between banks. Witnesses for both the sending and receiving banks testified that the cash letter and checks mentioned in count 1 of the indictment were sent by mail. A stamp was affixed to an envelope in which the checks were mailed as evidenced by "an air mail stamp shown to have been affixed by the Trust Company in the regular course of business to letters received by air mail." The Court held "that the introduction of this stamp was warranted both as a part of the proof of the ordinary business practice and as a record made in the ordinary course of the business . . ." *United States v. Leathers, supra* at 510. The Court stated:

"It cannot be reasonably argued that the extension of the common law book entry rule . . . or the statute . . . involve any violation of the Sixth Amendment." *Id.* at 511. The Court never said, as the *Miller* Court contends, that such evidence was admissible without in-court testimony by the person having knowledge of the recorded fact. Indeed, in *United States v. Leathers, supra,* the Court considered evidence indisputably admissible under the shopbook rule, a stamp affixed to the envelope in the regular course of the business to letters received by mail. But the evidence (the stamp) was admitted on the testimony of a bank cashier who testified concerning the usual practice of the bank in transmitting checks for collection between banks. Nothing in *Leathers* properly renders admissible the laboratory report which was considered by this Court in *Miller.*

*United States v. Miller, supra,* is, therefore, based upon two principal cases: *United States v. Evans, supra,* and *United States v. Leathers, supra. Evans,* as has been demonstrated, must fall, because its underlying rationale is contrary to the Manual for Courts-Martial and the Constitution of the United States. *Leathers* does not support the conclusions reached in *Miller.* Stamps affixed to envelopes during the regular course of the business of a bank are undeniably admissible under the business entry exception to the rule against hearsay evidence. Laboratory reports such as that considered in *Miller,* containing statements of chemical analysis, contain the opinions and evaluations of the persons who make them. That the Court found no violation of the Sixth Amendment concerning the admission of the stamp in *Leathers* did not rationally support the finding of the *Miller* Court that no denial of confrontation occurred. Like *United States v. Evans, supra, Miller* should be overruled.

## IV

### *Court-Martial Jurisdiction Over Specification 1*

The majority finds court-marital jurisdiction over the offense included in specification 1 of the charge where an undercover agent arranged, during a conversation with the appellant in a barracks building at Fort Meade, Maryland, to purchase a quantity of narcotics from him. A substance alleged to be lysergic acid diethylamide (LSD) was transferred to the undercover agent later that day at a residence in Laurel, Maryland, several miles away from Fort Meade and its environs. At the time he received the substance, the undercover agent gave the appellant a sum of money which had been agreed upon earlier during their conversation in the barracks building at Fort Meade. The majority views the agreement which the parties formed in the barracks building as, "contract to sell" and finds court-martial jurisdiction over the sale and transfer which occurred at the off-base residence.

I agree with the majority that conversations between the undercover agent and the appellant in the barracks building resulted in the formation of an understanding and that the object of the agreement was performed later that evening at a residence in Laurel, Maryland, where the transfer of the narcotic and the agreed-upon payment was made. My difference with the majority arises from their conclusion that the agreement made by the parties in the barracks and the later transfer and sale were in fact one transaction over which jurisdiction of a military court-martial exists. The characterization of the transaction as a "contract to sell" is a misnomer.[78] A "contract to sell" a prohibited narcotic is void and unenforceable.[79] The negotiations between the appellant and the undercover OSI agent at Fort Meade would constitute, if anything, evidence of intent on the appellant's part to sell the narcotic. But it is clear that the regulation here did not make the formation of an intent a punishable crime. These negotiations might also constitute evidence of a conspiracy, provided the OSI agent were also chargeable with that crime. But since the agent was involved in the investigation of criminal activity, it is unlikely that he would be charged with or convicted

of conspiracy. If the OSI agent is not chargeable with conspiracy, the charge would not lie against the appellant, for "[i]t is impossible in the nature of things for a man to conspire with himself." *Morrison v. California*, 291 U.S. 82, 92, 54 S.Ct. 281, 285, 78 L.Ed.2d 664 (1934). The crime of conspiracy contemplates "a corrupt agreement between not less than two with guilty knowledge on the part of each." *Id.* In the context of this case, if one of the two parties is deemed not chargeable with the offense of conspiracy, neither would be the other. *Morrison v. California, supra.*

It is thus clear to me that the sale and transfer of the narcotic occurred at the appellant's residence at Laurel, Maryland, and that jurisdiction of a court-martial to try that offense (specification 1) was nonexistent. *See United States v. Hedlund*, 2 M.J. 11 (C.M.A.1976).

V

For the reasons set forth above, I would hold that the trial judge committed error when he admitted and considered as evidence the laboratory report and the exhibits containing the chain of custody receipts and

---

78. While not applicable to criminal cases, a perusal of relevant provisions of the Uniform Commercial Code will reveal the distinction between a "sale" and a "contract to sell." "Under the Uniform Commercial Code [§ 2–106(1)], a 'sale' consists of the passing of title from the seller to the buyer for a price." 67 Am.Jur.2d, Sales, § 7. "A 'present sale' means a sale that is accomplished by the making of [a] contract." *Id.*, § 8, *see* Annotation, Construction and Effect of UCC Article 2, Dealing with Sales, 17 A.L.R.3d 1010. Courts look to the pre-Code law to determine whether a "sale" has taken place under the Uniform Commercial Code. 67 Am.Jur.2d, Sales, § 7. "Blackstone define[d] a sale as 'a transmutation of property from one man to another in consideration of some price or recompense in value." *Id.*, § 6. *Edwards v. Baldwin Piano Co.*, 79 Fla. 143, 83 So. 915; *State v. Colonial Club*, 154 N.C. 177, 69 S.E. 771; *W. T. Rawleigh Co. v. McCoy*, 96 Or. 474, 190 P. 311. The term "sale" is "also . . . defined . . . as 'a transfer of the property in a chattel for a consideration.'" 67 Am.Jur.2d, Sales, § 6. *Edward v. Ioor*, 205 Mich. 617, 172 N.W. 620, 15 A.L.R. 256; *Cooley v. Perrine*, 41 N.J.L. 322, affd., 42 N.J.L. 623;

*Stephens v. Gifford*, 137 Pa. 219, 20 A. 542; *Watson v. Odell*, 58 Utah 276, 198 P. 772, 20 A.L.R. 280. It cannot be disputed that, under the evidence, the transfer of the narcotic and the payment therefor was made at a residence in Laurel, Maryland. It is, of course, true that under § 2–106(1), Uniform Commercial Code, "a 'contract' and an 'agreement' . . . are limited to those relating to the present or future sale of goods." 67 Am.Jur.2d, Sales, § 10. "A 'contract for sale' includes both a present sale of goods and a contract to sell goods at a future time." *Id.* § 8; 17 A.L.R.3d at 1048, § 5. But, as noted below, (*see* text at n. 79) an agreement to sell and sales violative of the law are illegal. The court-martial was powerless, therefore, to punish.

79. "The general rule is that illegal transactions are void, and the courts will not recognize rights as springing therefrom or enforce such agreements . . . Under this rule, no action can be based on an illegal agreement by one party against the other, either at law or in equity." 67 Am.Jur.2d, Sales, § 53.

the evidence tag.[80] I would also hold that the court-martial was without jurisdiction to try the offense set forth in specification 1 of the charge. I concur with the Chief Judge's determination that the court-martial was without jurisdiction to try the offense set forth in specification 4 of the charge. I would, therefore, reverse the decision of the United States Air Force Court of Military Review. I would set aside the findings and the sentence and would direct that specifications 1 and 4 of the charge be dismissed. As to specifications 2 and 3 of the charge, I would return them to the appropriate authorities who could order a rehearing.

**80.** *See* nn. 5, 6, *supra.*